J-A28017-22

2023 PA Super 113

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY ROSS | : | No. 775 EDA 2022 |

Appeal from the Order Entered February 22, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002944-2019

BEFORE:  PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

OPINION BY PANELLA, P.J.:                                      **FILED JUNE 20, 2023**

In this case, we address whether a single question by a police officer during a lawful traffic stop, which we classify as a mere inconvenience for the driver, violated the United States Constitution and the Pennsylvania Constitution when balanced against legitimate concerns for the officer's safety.  The Commonwealth of Pennsylvania appeals from the order granting Anthony Ross's motion to suppress a firearm recovered during a traffic stop. The Commonwealth argues that the officer reasonably asked Ross whether he had a gun in the course of completing his routine tasks during the traffic stop to ensure the safety of the officers and did not initiate a new investigation. We reverse the trial court's suppression of the evidence and remand for further proceedings.

The facts are largely undisputed. On April 9, 2019, at 9:33 p.m., Philadelphia Police Officers Gregory Kotchi and Lewis Armstrong stopped Ross's vehicle for driving without an operable center brake light. Ross was the driver and sole occupant of the vehicle. Officer Kotchi went to the driver's side to talk to Ross while Officer Armstrong stood outside the passenger side of Ross's vehicle. Officer Kotchi asked Ross if there were anything in the vehicle to be worried about and Ross replied in the negative. Officer Kotchi then took Ross's driver's license and vehicle paperwork and returned to his squad car to run them through various law enforcement databases. While Officer Kotchi ran Ross's information, Officer Armstrong remained standing next to Ross's vehicle. The search revealed no issues with Ross's license or vehicle. However, the National Crime Information Center ("NCIC") returned an alert that Ross had been previously licensed to carry a firearm, but that the license had been revoked. At a later hearing, Officer Kotchi indicated that in his experience, people who applied for a firearm permit generally carried a firearm. As a result, Officer Kotchi was concerned that Ross may have possessed a firearm in the vehicle, which could endanger him or Officer Armstrong.

Officer Kotchi returned to Ross's vehicle with Ross's license, and asked Ross if he had a firearm. Ross replied that he had a firearm on his hip. Officer Kotchi responded that Officer Armstrong was going to remove the firearm. Ross complied, raising his hands, and allowing Officer Armstrong to open the passenger door and remove the firearm from his hip. The officers returned to

their vehicle with Ross's license and the firearm.[1] The officers reported the traffic stop on police radio and asked the radio operator to check the status of Ross's firearm permit. The radio confirmed that Ross's firearm license had been revoked. The officers then arrested Ross. The entire encounter, including the stop and arrest, took approximately 10 minutes.

The Commonwealth charged Ross with possession of a firearm without a license and carrying a firearm on the streets of Philadelphia. Ross filed a motion to suppress the firearm. The trial court held a hearing, at which Officer Kotchi testified. Thereafter, the trial court suppressed the firearm, finding that Officer Kotchi's question to Ross about the firearm constituted a new and separate investigation from the traffic stop, and was unsupported by reasonable suspicion. The trial court stated that it was not "a normal part of a car stop for a police officer to walk over to the defendant and ask whether that defendant has X, Y, Z on them without any other intervening circumstances." N.T., 2/22/22, at 35. The trial court further found that Officer Kotchi asked about a gun "not because he felt unsafe but because he had the information about the revoked permit." *Id.* at 37. The trial court concluded

---

[1] The trial court erroneously found that Officer Kotchi returned the license to Ross prior to asking whether he possessed a firearm. *See* Trial Court Opinion, 5/24/22, at 2-3. However, video surveillance of Officer Kotchi's body camera confirmed that he never returned the license prior to asking about the firearm. *See* Commonwealth Ex. C1.

that the revocation of a carrying permit does not provide reasonable suspicion of unlawful activity. The Commonwealth timely appealed.[2]

The Commonwealth raises the following question for our review: "Did the lower court err in suppressing the gun that [Ross] admitted to police he was carrying after police asked him whether he had a gun to confirm their safety in the process of conducting a valid traffic stop?" Brief for the Commonwealth at 4.

Our standard of review in addressing a trial court's order granting a suppression motion is as follows:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

***Commonwealth v. Galloway***, 265 A.3d 810, 813 (Pa. Super. 2021) (citation omitted). Further, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given

---

[2] The Commonwealth certified that the trial court's order substantially handicaps its prosecution in accordance with Pa.R.A.P. 311(d).

their testimony." ***Commonwealth v. Luczki***, 212 A.3d 530, 542 (Pa. Super. 2019) (citation omitted).

The Commonwealth contends that the trial court erred in granting the suppression order. ***See*** Brief for the Commonwealth at 11, 21. The Commonwealth argues that Officer Kotchi did not initiate a new investigation during the traffic stop but instead reasonably asked Ross whether he had a gun in the course of completing his routine tasks for the single traffic stop to ensure his safety and that of Officer Armstrong. ***See id.*** at 11, 13, 18. The Commonwealth claims that such a "mission-related" inquiry was permitted by ***Rodriguez v. United States***, 575 U.S. 348 (2015). ***See*** Brief for the Commonwealth at 13.

To that end, the Commonwealth highlights that during traffic stops, officers may ensure their safety by ordering the occupants out of a vehicle and inquiring about the presence of weapons, as a matter of course and even absent reasonable suspicion of criminal activity. ***See id.*** at 12-13, 18. Further, the Commonwealth asserts that ***Rodriguez*** permitted Officer Kotchi to run Ross's information through the police databases, where he learned about Ross's revoked firearm permit. ***See id.*** at 13. According to the Commonwealth, Officer Kotchi believed his and Officer Armstrong's safety was at issue upon learning of the revoked license based upon his experience that a person who obtains a firearm permit would normally possess a firearm. ***See id.*** at 13-14, 19-20. The Commonwealth concludes that the traffic stop was

ongoing at the time of the inquiry because Officer Kotchi had not written a ticket or warning, he retained Ross's license, and he continued to make inquiries related to the traffic stop; therefore, Officer Kotchi was permitted to ask whether Ross possessed a firearm for his safety. ***See id.*** at 14.

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures." ***Luczki***, 212 A.3d at 542. "To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." ***Id.*** (citation omitted).

Generally, a motor vehicle stop is an investigative detention. ***See Commonwealth v. Spence***, 290 A.3d 301, 314 (Pa. Super. 2023). "[A]n investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest." ***Id.*** (citation omitted). "Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." ***Id.*** (citation omitted).

In the context of a traffic stop, the United States Supreme Court held that the duration of police inquiries "is determined by the seizure's 'mission'—

to address the traffic violation that warranted the stop … and attend to related safety concerns." ***Rodriguez***, 575 U.S. at 354 (citations omitted). A stop becomes unlawful when it "last[s] … longer than is necessary" to complete its mission, the rationale being that the "[a]uthority for the seizure … ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." ***Id.*** (citations omitted). The Supreme Court elaborated that "[t]he critical question … is not whether the [inquiry] occurs before or after the officer issues a ticket, … but whether [it] prolongs—, *i.e.*, adds time to—the stop." ***Id.*** at 357 (quotation marks and citations omitted); ***see also id.*** at 355 ("An officer … may conduct certain unrelated checks during an otherwise lawful traffic stop. But … he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." (citation omitted)).

"[A]n officer's mission includes ordinary inquiries incident to the traffic stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." ***Id.*** at 355 (quotation marks, citation, and brackets omitted). Further, tasks relating to officer safety are also part of a traffic stop's mission when done purely in an interest to protect the officers. ***See id.*** at 356. This safety interest stems from the fact that "[t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his

mission safely." *Id.* at 356 (quotation marks and citations omitted); *see also Commonwealth v. Clinton*, 905 A.2d 1026, 1030 (Pa. Super. 2006) (noting that the concern for officer safety is so serious that it "outweighs the minor intrusion on … drivers and passengers whose freedom of movement had already been curtailed by the traffic stop." (citation and emphasis omitted)).

To effectuate the safety of officers, during "a lawful traffic stop, the officer may order the driver of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot." *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019) (citation, ellipses, and brackets omitted); *see also Commonwealth v. Pratt*, 930 A.2d 561, 567-68 (Pa. Super. 2007) (noting that "allowing police officers to control all movement in a traffic encounter … is a reasonable and justifiable step towards protecting their safety."); *see also Commonwealth v. Brown*, 654 A.2d 1096, 1100 (Pa. Super. 1995). Further, an officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Spence*, 290 A.3d at 314 (citation omitted). To that end, for their own safety, officers may ask drivers whether they have a weapon or anything concerning as a matter of course during a traffic stop. *See Clinton*, 905 A.2d at 1031 (holding that a question by police regarding the presence of a weapon during a traffic stop is constitutionally permissible, stating that such a question

"unquestionably and completely" falls on the side of officer safety and "is clearly less intrusive than a request by police to exit the vehicle.").

Importantly, not all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission, as measures aimed at finding evidence of other crimes or safety precautions taken to facilitate detours from the mission do not pass constitutional muster. *See Rodriguez*, 575 U.S. at 355-56; *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (stating that "while the concern for officer safety in this context may justify the 'minimal' additional intrusion of ordering a driver and passengers out of the car, it does not by itself justify the often considerably greater intrusion attending a full field-type search.").

Recently, this Court applied the reasoning in *Rodriguez* regarding the "mission-related" questions during a traffic stop in *Commonwealth v. Malloy*, 257 A.3d 142 (Pa. Super. 2021). There, a police officer stopped a vehicle due to a missing license plate. *See id.* at 145. The vehicle had several occupants including Malloy, who was seated in the rear behind the driver. *See id.* The officer asked Malloy for identification, who in response, pulled out a lanyard from his hooded sweatshirt. *See id.*

Upon observing the lanyard, the officer immediately asked Malloy whether he had a firearm. *See id.* The officer explained that "in his experience, it was common for people who worked in armed security positions at local bars to keep their identification badges in lanyards." *Id.*

Malloy replied that he possessed a firearm and worked as a security guard at a bar where he and the other occupants of the vehicle had just finished working. *See id.* The officer then secured the firearm for his safety and the safety of the other occupants of the vehicle. *See id.* Subsequently, the officer questioned Malloy regarding his firearm licensure status, and Malloy gave the officer an "Act 235" card. *See id.* at 146. The officer noticed the card had expired and thereafter confirmed that Malloy did not have a valid license to carry. *See id.* at 146. The officer then arrested Malloy but did not issue a citation to the driver of the vehicle. *See id.* Malloy filed a motion to suppress the firearm, which the trial court denied. *See id.* at 146-47.

On appeal, this Court concluded that the trial court erred in failing to grant Malloy's suppression motion. *See id.* at 156. Initially, this Court found that the officer's stop of the vehicle was valid. *See id.* at 149. Further, this Court observed that the officer had the authority to ask Malloy about the presence of weapons or surrender the gun to the police. *See id.* at 152-53. However, applying ***Rodriguez***, the Court concluded that the officer's questions to Malloy regarding his authorization to possess the firearm were not "mission related" inquiries relating to the traffic violation. *See id.* at 150-53. We explained:

> once [the officer] secured the firearm, [Malloy's] legal authority to own or possess a gun clearly bore no discernible relationship to individual safety or security within the context of the traffic stop. Under these circumstances, where seizure of a firearm has substantially diminished the risk to officers and others who may be present during a lawful vehicle detention, we see no reason

- 10 -

why the Fourth Amendment, in the absence of independent justification, suspicion, or cause, should tolerate even a 10- to 15-minute extension of a routine traffic stop for the investigation of a secondary criminal matter. Hence, the request challenged in this case does not fall within the category of actions the police may undertake during a lawful traffic stop based solely on concerns for safety and security and without independent justification or cause.

*Id.* at 153; *see also id.* at 152 (noting "that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured.").

Moreover, this Court found that the antecedent investigative detention of Malloy, which commenced when the officer restrained his liberty to ask about Malloy's authority to possess a firearm, was not supported by reasonable suspicion. *See id.* at 154-55 (citing *Commonwealth v. Hicks*, 208 A.3d 916, 936 (Pa. 2019) (holding that mere possession of a firearm did not establish reasonable suspicion to allow an officer to approach and detain an individual in order to investigate whether he or she was properly licensed to carry a firearm in public)). Therefore, this Court concluded that the evidence and any statements made by Malloy must be suppressed. *See id.* at 156.

Here, the trial court granted Ross's motion to suppress for the following reasons:

The traffic stop terminated once the officers investigated [Ross's] inoperable center brake light, [and] determined that he had no outstanding warrants…. The officers' further questioning as to whether [Ross] had a weapon went beyond the scope of the

- 11 -

initial motor vehicle code investigation. The court's findings are supported by the record as Officer Kotchi stated [Ross] did not present as a threat to the officers' safety, … and "entered into a new series of questions" only after learning [Ross's] license to carry a firearm was revoked.

Officers pulled [Ross] over to investigate an inoperable center brake light. [Ross] cooperated and provided the officers with the requested documents. The officers returned to their police car and, using various police databases, confirmed the validity of the documents. The officers also determined that [Ross] had no outstanding warrants. A check of [Ross's] gun license status indicated [Ross's] license to carry had been revoked. … At the suppression hearing, Officer Kotchi testified that he had no reason to believe [Ross] was armed and dangerous; his inquiry was based solely on the database indicating a revoked license to carry a firearm. … The officers did not know the reason why [Ross's] license was revoked, and the mere fact of revocation does not independently create reasonable suspicion to allow for extension of a motor vehicle stop and initiation into a secondary investigation. …

[Ross] in the current case was held beyond reasonable time needed to issue a traffic ticket without reasonable suspicion of independent criminal activity separate from the traffic violation. … The questioning here was clearly not part of the mission of issuing a traffic ticket. The officer stated the sole reason he pursued a new series of questions (after completing the investigation into [Ross's] motor vehicle stop) was due to [Ross's] "revoked" carrying permit. Revocation of a carrying permit does not give rise to reasonable suspicion of criminal activity allowing for extension of [Ross's] traffic stop or a subsequent investigation into unlawful activity.

Trial Court Opinion, 5/24/22, at 2-3, 4.

We disagree with the trial court's reasoning. Upon review, we conclude that the valid traffic stop was ongoing at the time Officer Kotchi asked whether Ross possessed a firearm because he had not concluded the stop with a warning or citation or indicated that Ross could leave. ***See, e.g.,***

*Commonwealth v. Dales*, 820 A.2d 807, 814 (Pa. Super. 2003). In fact, Officer Kotchi in no way unnecessarily prolonged the stop, as he completed his routine check of the various databases and asked the question after he walked back to Ross's vehicle while holding Ross's license. *See Rodriguez*, 575 U.S. at 354 (noting that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission — to address the traffic violation that warranted the stop and attend to related safety concerns." (citation omitted)); *id.* (stating that database checks are constitutionally permissible so long as they do not unreasonably extend the time of the stop). Therefore, because this was a valid ongoing vehicle stop, Officer Kotchi, for his and Officer Armstrong's safety, could inquire about the presence of weapons. *See Malloy*, 257 A.3d at 150, 152-53 (noting that during a traffic stop, police officers may inquire about the presence of weapons for their own safety); *Clinton*, 905 A.2d at 1031 (holding that a question by police regarding the presence of a weapon during a traffic stop is constitutionally permissible, stating that such a question "unquestionably and completely" falls on the side of officer safety and "is clearly less intrusive than a request by police to exit the vehicle.").[3]

---

[3] While Officer Kotchi testified that he "entered into a new series of questions" upon learning of the revoked firearms license, *see* N.T., 2/22/22, at 23, we do not find this statement established that the traffic stop had concluded or that a new investigative detention had been initiated. As noted above, Officer
*(Footnote Continued Next Page)*

- 13 -

Moreover, although the trial court indicates that the officers could not have felt unsafe, **see** N.T., 2/22/22, at 37, we conclude that a reasonable officer, under these factual circumstances, would believe his and his partner's safety was at issue and could inquire about a firearm. **See Commonwealth v. Cooper**, 994 A.2d 589, 592 (Pa. Super. 2010) (stating that an officer is not required to be absolutely certain the individual is armed; rather an officer only has to reasonably believe that his safety or the safety of others was in danger); **see also Commonwealth v. Cartagena**, 63 A.3d 294, 304 (Pa. Super. 2013) (noting that "we view facts not in isolation but in light of the totality of the circumstances when determining whether the police officers here had reasonable suspicion to have concern for their safety."). Significantly, when Officer Kotchi learned about the revoked firearms license, Officer Armstrong was standing outside Ross's vehicle and unaware of the possible firearm and Officer Kotchi still possessed Ross's driver's license and had to return it. Officer Kotchi explicitly testified that in his experience, people who applied for a firearm permit generally carry a firearm, and that he was

_____

Kotchi in no way prolonged the stop because he made the inquiry just after completing a routine check of the various databases and as he walked back to Ross's vehicle while holding Ross's license. **See Rodriguez**, 575 U.S. at 354. Based upon this timing, and his knowledge of the revoked firearms license, Officer Kotchi was permitted to ask Ross about possessing a firearm for his own and Officer Armstrong's safety. **See Commonwealth v. Dunham**, 203 A.3d 272, 279 (Pa. Super. 2019) (holding that officer safety is a heightened concern during traffic stops); **see also Rodriguez**, 575 U.S. at 356.

concerned that the possession of a firearm by Ross could endanger him or Officer Armstrong. **See** N.T., 2/22/22, at 8; **see also Commonwealth v. Holmes**, 14 A.3d 89, 95 (Pa. 2011) (noting that a court must give weight to the inferences that a police officer may draw through training and experience). Therefore, based upon information available to Officer Kotchi, he had a reasonable belief that his safety or the safety of Officer Armstrong was in danger. **See Cooper**, 994 A.2d at 592.

We find guidance in the United States Supreme Court's decision in **Pennsylvania v. Mimms**, 434 U.S. 106 (1977) (**Mimms II**). There, the United States Supreme Court considered the reasonableness of a police officer's action of ordering a driver to step out of his vehicle during a routine traffic stop by balancing the public interest in ensuring the safety of law enforcers against "the individual's right to personal security free from arbitrary interference by law officers." **Id.** at 109. Relying on studies about the incidence of assaults and murders of police officers resulting generally from contacts with suspects in motor vehicles and specifically from contacts with persons stopped for traffic violations, the United States Supreme Court found the safety of the officer to be "both legitimate and weighty." **Id.** at 110. In balancing this important interest against the intrusion into a driver's personal liberty occasioned by an order to get out of the car, the Court described the individual interest as "*de minimus.*" **Id.** at 111. The Court concluded:

> The police have already lawfully decided that the driver shall be
> briefly detained; the only question is whether he shall spend that

period sitting in the driver's seat of his car or standing along side it.... What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

*Id*. at 111, 98 S.Ct. at 333.

In **Brown**, we closely examined **Mimms II** and concluded that "the interest in the safety of law enforcement officers outweighs the *de minimus* intrusion to the individual who is asked to step outside a lawfully stopped motor vehicle." **Brown**, 654 A.2d at 1103. Clearly, the asking of an additional question or two about a firearm was less intrusive than the order to exit the vehicle, which was found to be constitutionally sound in **Mimms II** and **Brown**.

Additionally, we conclude that **Malloy** is not a factual and procedural parallel to this case. In **Malloy**, the officer properly seized the firearm and then improperly asked about the defendant's right to possess the gun, despite the fact the officer's safety had already been secured. Contrarily, in this case, the officers' safety had not been secured, as Officer Kotchi found that Ross had a revoked license to carry a firearm during his routine check of the relevant databases following the valid traffic stop, and then he asked about the presence of a firearm. Furthermore, unlike **Malloy**, Officer Kotchi confirmed the revoked status of Ross's license, without further questioning

Ross. For these reasons, we find **Malloy** to be distinguishable from the instant case.[4]

We also conclude that the holding in **Hicks, supra**, does not require suppression of the firearm. Unlike **Hicks**, the police did not initiate an investigative detention on the grounds that Ross was armed; rather there was a lawful stop based upon a violation of the Vehicle Code. Moreover, the **Hicks** Court specifically noted that it offered "no opinion as to whether a police officer who has effectuated a lawful investigative detention may treat the suspect's possession of a firearm as per se authorization to 'frisk' the detainee." **Hicks**, 208 A.3d at 934. The Court explained that decisions involving whether an armed individual is dangerous for purposes of a **Terry** frisk "have no relevance to this appeal." **Id.** Because Officer Kotchi was permitted to ask Ross if he possessed a firearm during the valid traffic stop for his and Officer Armstrong's safety, the holding in **Hicks** is inapplicable to this case.

It bears emphasizing that balancing the constitutional rights of motorists, the public protection objectives, and police officer safety is difficult, especially in the context of rapidly evolving traffic stops. One particular

---

[4] Likewise, this conclusion does not run afoul of **Commonwealth v. Arrington**, 233 A.3d 910 (Pa. Super. 2020). In **Arrington**, this Court determined that an officer's knowledge based on a NCIC search during a traffic stop that the defendant had a revoked firearm permit does not provide reasonable suspicion to search the defendant's vehicle for a firearm. **See id.** at 917. Here, as noted above, Ross admitted to possessing a firearm when asked by Officer Kotchi, and the officers did not conduct a search of Ross's vehicle. Accordingly, **Arrington** is not applicable to this case.

concern for officers during a traffic stop is the proliferation of guns, including the substantial increase in the number of people possessing firearms, the rise in mass shootings, and the ability to carry a concealed weapon in vehicles in Pennsylvania.[5] **See Mimms II**, 434 U.S. at 110  ("[I]t appears that a significant percentage of murders of police officers occurs when the officers are making traffic stops." (citation omitted)). Clearly, neither the United States Constitution nor the Pennsylvania Constitution require officers to gamble with their personal safety during traffic stops. **See Rodriguez**, 575 U.S. at 356; **Clinton**, 905 A.2d at 1030. Therefore, in the context of traffic stops, police officers may take reasonable precautions when the circumstances give rise to legitimate safety concerns.

Nevertheless, we emphasize that the constitutionality of mission-specific questions, including those related to the safety of the officer, during a traffic stop, and the determination of the **Rodriguez** moment, *i.e.*, when tasks tied to the traffic stop are completed or reasonably should have been completed, is fact specific. We further reiterate that the mere possession of a

---

[5] The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") recently released a report, which indicated that stolen guns, untraceable weapons, and other deadly devices are used more prevalently in gun crimes in the United States. **See** https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-crime-guns-volume-two. Additionally, the ATF noted that gunmakers have produced nearly three times as many firearms in 2020 as in 2000. **See** https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download.

firearm does not establish reasonable suspicion to allow an officer to approach and detain an individual in order to investigate whether he or she was properly licensed to carry a firearm in public. *See Hicks*, 208 A.3d at 936. However, Officer Kotchi asking Ross whether he had a firearm was not investigative and falls within the category of actions police officers may undertake during a lawful traffic stop based solely on concerns for their safety and security and without independent justification or cause. Because we conclude that the concerns for the safety of the officers justified the proportional intrusion on Ross, the motion to suppress should have been denied.

In closing, we reiterate the cautionary words of the United States Supreme Court:

> According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J.Crim.L.C. & P.S. 93 (1963)." We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. Indeed, it appears "that a significant percentage of murders of police officers occurs when the officers are making traffic stops." Id., at 234, n. 5, 94 S.Ct. at 476, n. 5.

*Mimms II*, 434 U.S. at 106 (case citations omitted).

For these reasons, we reverse the trial court's order granting Ross's suppression motion, and remand for further proceedings.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/20/2023</u>