J-S37041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAMONT DRAINE, JR. | : | |
| | : | |
| Appellant | : | No. 82 EDA 2022 |

Appeal from the Judgment of Sentence Entered November 23, 2021
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0007384-2019

BEFORE: BOWES, J., LAZARUS, J., and OLSON, J.

DISSENTING MEMORANDUM BY BOWES, J.: **FILED NOVEMBER 1, 2023**

I agree with the learned majority that Appellant's violation of the Vehicle Code provided justification for the initial stop and frisk for safety. **See** Majority at 9-12. Where I diverge, however, is in the Majority's conclusion regarding what law enforcement officers may do after seizing a firearm from an individual involved in the stop. In particular, I cannot agree that our case law requires officers investigating illegal activity to possess reasonable suspicion merely to check the licensure status of an individual in a manner that does not prolong a valid stop before they return a firearm to that individual. Accordingly, I respectfully dissent.

I find it prudent to begin with an overview of the relevant precedent pertaining to traffic-related stops and police authority to check a defendant's firearm licensure status. In **Rodriguez v. United States**, 575 U.S. 348, 350 (2015), the Supreme Court of the United States was presented with "the

question [of] whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop." In considering this question, the Court outlined the parameters of police authority during traffic stops:

> A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called **Terry v. Ohio**, 392 U.S. 1 (1968), stop than to a formal arrest. Like a **Terry** stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.
>
> . . . .
>
> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

**Id**. at 354-55 (cleaned up).

The **Rodriguez** Court distinguished these mission-related purposes with the dog sniff at issue in that case, which "is a measure aimed at detecting evidence of ordinary criminal wrongdoing" and therefore "not fairly characterized as part of the officer's mission." **Id**. at 355-56 (cleaned up). It also distinguished the dog sniff from the "[h]ighway and officer safety" concerns "stem[ming] from the mission of the stop itself" that may require an

officer "to take certain negligibly burdensome precautions in order to complete his mission safely." *Id*. at 356-57 (cleaned up). Ultimately, the Court reasoned that the dog sniff could not be justified on the same basis as an order to exit the car, even if the levels of intrusion were identical. *Id*. Rather, the Court determined that "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff "prolongs"—*i.e.,* adds time to—"the stop." *Id*. at 357 (cleaned up). Thus, the Court held as follows:

> [A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.

*Id*. at 350-51 (cleaned up).

Thereafter, in *Commonwealth v. Hicks*, 208 A.3d 916, 921 (Pa. 2019), our Supreme Court overturned a longstanding rule, first announced by this Court in *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa.Super. 1991), that "'possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed.'" *Hicks*, *supra* at 921 (quoting *Robinson*, *supra* at 959). In that case, a bystander saw Hicks with a firearm and reported it to police. Notably, Hicks was not observed engaging in any illegal activity. The High Court stated that "an

- 3 -

individual licensed to carry a firearm may do so in public, openly or concealed, within a vehicle or without, throughout every municipality in Pennsylvania." *Id*. at 926. It also expressly rejected the Commonwealth's position that police officers are "duty bound to seize and investigate the licensing status of every individual who carries a concealed firearm in Pennsylvania." *Id*. at 932 (cleaned up). The Court explained that it was overruling *Robinson* because that "holding facially contravene[d] established law . . . , demand[ed] no suspicion of criminal activity—let alone individualized suspicion—and countenance[d] a sweeping and unjustified expansion of the authority of law enforcement to seize persons upon the basis of conduct that, standing alone, an officer cannot reasonably suspect to be criminal." *Hicks*, *supra* at 947.

Subsequently, this Court decided *Commonwealth v. Malloy*, 257 A.3d 142 (Pa.Super. 2021). In *Malloy*, an officer stopped a vehicle based upon the improper placement of a license plate. Malloy was a passenger in the vehicle. When asked for identification, he produced a lanyard, which the officer associated with an individual working as an armed security guard, and therefore the officer asked whether he had a firearm. Malloy responded affirmatively that the firearm was located on his hip. For safety, the officer asked him to exit the vehicle so he could secure the firearm, and then asked him for his firearms credentials. During the ensuing fifteen to twenty minutes, the officer conducted various checks with local detectives and the Pennsylvania State Police to determine whether Malloy had a valid license to carry. He was arrested after they determined that he did not. *Id*. at 145-46.

In denying suppression in **Malloy**, the trial court first concluded that, pursuant to **Rodriguez**, the checks run by the officer during the traffic stop were permissible. This Court rejected that conclusion:

> [N]either the trial court nor the Commonwealth cite legal authority which equates an investigation of a passenger's documented authority to carry a firearm to the incidental inquiries permitted during a lawful traffic stop under **Rodriguez** and which promote safe and financially responsible operation of motor vehicles. More tellingly, neither the trial court nor the Commonwealth offer any explanation as to how or why a passenger's firearms licensure status relates to these incidental inquiries or, more broadly, to the safe and financially responsible operation of a motor vehicle in general. We are convinced that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured. As such, we reject the trial court's conclusion that [the officer's] request for [Malloy's] documented firearms authorization could be pursued as incidental to the traffic stop herein.
>
> We also reject the suggestion that [the officer's] request fell within the limited class of minimally intrusive and permitted demands police officers may make, out of concern for officer safety and without independent justification, during the course of a lawful traffic stop. [Malloy] forwards no claim that [the officer] lacked authority to ask for identification, to inquire about the presence of weapons, to request that Appellant exit the vehicle, or to demand that [he] surrender his firearm for the duration of the stop. Moreover, our reading of the transcript reveals that [the officer] secured [the] firearm without incident before requesting that [Malloy] produce documentation that the firearm was lawfully in his possession. [The] seizure of the firearm essentially eliminated any immediate risk the weapon posed to law enforcement personnel, bystanders, and occupants of the vehicle for the duration of the stop and transformed the officer's pursuit of [Malloy's] firearms credentials into an inquiry exclusively aimed at collecting evidence of collateral wrongdoing. **See Rodriguez**, 575 U.S. at 355. Put differently, once [the officer] secured the firearm, [Malloy's] legal authority to own or possess a gun clearly

- 5 -

bore no discernible relationship to individual safety or security within the context of the traffic stop. Under these circumstances, where seizure of a firearm has substantially diminished the risk to officers and others who may be present during a lawful vehicle detention, we see no reason why the Fourth Amendment, in the absence of independent justification, suspicion, or cause, should tolerate even a 10- to 15-minute extension of a routine traffic stop for the investigation of a secondary criminal matter. Hence, the request challenged in this case does not fall within the category of actions the police may undertake during a lawful traffic stop based solely on concerns for safety and security and without independent justification or cause.

*Id*. at 152-53 (cleaned up).

Finally, I find guidance from this Court's recent decision in *Commonwealth v. Ross*, 297 A.3d 787, 792 (Pa.Super. 2023). Ross was pulled over for driving with an inoperable brake light. In running his license and registration, the officer learned that, while there were no problems with either of those, his license to carry a firearm had been revoked. Before returning his license, the officer asked Ross whether he had a firearm, to which he replied in the affirmative. The officer secured the firearm and arrested Ross. The entire stop lasted approximately ten minutes. *Id*. at 790. The trial court ultimately granted Ross's motion to suppress, concluding that the questioning exceeded the scope of the traffic stop and extended the reasonable time needed to issue a traffic citation. *Id*. at 794-95.

Upon review, this Court disagreed with the trial court. We observed that "the constitutionality of mission-specific questions, including those related to the safety of the officer, during a traffic stop, and the determination of . . . when tasks tied to the traffic stop are completed or reasonably should have

- 6 -

been completed, is fact specific." *Id*. at 798. In **Ross**, that fact-specific analysis resulted in a conclusion that "the valid traffic stop was ongoing at the time [the officer] asked whether Ross possessed a firearm because he had not concluded the stop with a warning or citation or indicated that Ross could leave." *Id*. at 795 (cleaned up). Additionally, we held that the officer "in no way unnecessarily prolonged the stop, as he completed his routine check of the various databases and asked the question after he walked back to Ross's vehicle while holding Ross's license." *Id*. (cleaned up). Since the stop was still ongoing, the officer was permitted to inquire about the presence of firearms. *Id*.

As to the officer's safety concerns, we observed that "the interest in the safety of law enforcement officers outweighs the *de minimus* intrusion to the individual who is asked to step outside a lawfully stopped motor vehicle[, and] the asking of an additional question or two about a firearm was less intrusive than the order to exit the vehicle[.]" *Id*. at 796-97 (cleaned up). Indeed, the Court elaborated on officer safety concerns during traffic stops:

> It bears emphasizing that balancing the constitutional rights of motorists, the public protection objectives, and police officer safety is difficult, especially in the context of rapidly evolving traffic stops. One particular concern for officers during a traffic stop is the proliferation of guns, including the substantial increase in the number of people possessing firearms, the rise in mass shootings, and the ability to carry a concealed weapon in vehicles in Pennsylvania. Clearly, neither the United States Constitution nor the Pennsylvania Constitution require officers to gamble with their personal safety during traffic stops. Therefore, in the context of traffic stops, police officers may take reasonable precautions

when the circumstances give rise to legitimate safety concerns. *Id*. at 797–98. The *Ross* Court distinguished Ross's scenario from that in *Malloy*, focusing on the fact that the officer's safety in *Malloy* was secured by the seizure of the firearm, and therefore the subsequent inquiry into Malloy's licensure status was improper. *Ross*, *supra* at 797.

In light of the foregoing precedent, I deem it appropriate to apply a fact-specific test to determine whether the permit check ran afoul of Appellant's constitutional rights. In this case, Patrolmen Dylan Glenn and Charles Waters were on patrol in Chester Township when they observed Appellant and Lawrence Cook walking in the middle of the roadway in a high crime area at approximately 12:45 a.m. on November 21, 2019, despite the presence of a sidewalk along that street. *See* N.T. Suppression, 9/1/20, at 7-9, 12-16, 18, 61. Based upon the violation of pedestrians walking along the highway, Patrolman Glenn approached the individuals. Patrolman Glenn identified himself and notified the two men as to why he was stopping them. *Id*. at 20. In response, the two individuals argued that there was no sidewalk available. *Id*. at 40.

The patrolmen prepared to pat down Mr. Cook and Appellant for safety reasons. Before doing so, Patrolman Waters asked Appellant if he had any weapons or anything on his person that could harm the patrolman. Appellant responded that he had a firearm and, upon further inquiry, directed the patrolman to his backpack. *Id*. at 21-22, 62-63. Patrolman Waters removed

the backpack and secured the firearm. *Id*. at 23, 63. Thereafter, he obtained identification from Appellant. *Id*. at 62-63. Patrolmen Glenn then ran background checks on both individuals and determined after a permit check that Appellant did not have a conceal-carry permit. *Id*. at 26.

Unlike in *Malloy*, Appellant was not merely a passenger in a vehicle stopped for a motor vehicle infraction, but rather a principal actor who was stopped and being investigated for violating the Vehicle Code by walking in the middle of the street. Moreover, this illegal conduct occurred late at night in a high crime area, and Appellant and Mr. Cook argued with the patrolmen regarding the reason for the stop and the availability of a sidewalk. Thus, the firearm check in this case was "supported by something more than the mere possession of a firearm." Majority at 15.

Regardless of these additional factors, the stop was not prolonged by the ensuing permit check. Rather, my review of the record bears out that it was completed simultaneously with the permissible identification checks and while the stop remained ongoing. Finding that there was no extension of the valid traffic-related stop in this case, reasonable or otherwise, I would conclude that the patrolmen's actions did not violate our case law and do not warrant suppression. *See Ross*, *supra* at 798 ("Because we conclude that the concerns for the safety of the officers justified the proportional intrusion on Ross, the motion to suppress should have been denied.").

While I find this matter factually distinguishable from *Malloy* and would reverse on that basis, I am also troubled by *Malloy*. While it concedes that the safety risks of a traffic-related stop are secured by the seizure of a firearm, it then demands that the firearm must, at some point, be returned by the officers before the safety concerns can be fully addressed. Respectfully, I believe such a rule to be untenable. Practically speaking, to suggest that an officer cannot explore the legality of the possession of a firearm seized during a valid traffic stop for safety begs the question: are they just supposed to give it back to the individual when the stop is concluded without ascertaining whether the owner is entitled to possess it? Surely if officer safety permits the intrusive action of seizing the firearm, the same safety concerns must allow the unintrusive act of extending the valid stop for a minimal amount of time to ensure the officers are not re-arming someone barred from carrying a firearm while the officers remain vulnerable.

Such an inquiry can readily be completed in a timely manner that does not prolong the stop. If it does prolong the stop unreasonably, then it violates *Rodriguez* and suppression may be warranted. When it does not, however, *Rodriguez* instructs that "negligibly burdensome precautions" must be permitted. *Rodriguez*, *supra* at 356. Otherwise, we are left with caselaw that permits officers to inquire about firearms during traffic stops and to seize any firearms temporarily for officer safety but prohibits them from

determining whether the owner of the firearm may lawfully possess it before returning it at the conclusion of the stop.

Thus, pursuant to **Malloy**, an officer conducting a traffic-related stop where a firearm is present is faced with a no-win scenario. If she decides to run a firearm permit check during without prolonging the interaction, she nonetheless risks the possibility of suppression of any contraband discovered thereafter. On the other hand, if the officer decides not to run a check, she risks her safety by potentially returning a firearm to an individual who may have had their license to carry revoked for wrongdoing and who has every incentive to avoid being arrested for the firearm violation. I find this *non sequitur* troubling. It is an overextension of the holdings in **Rodriguez** and **Hicks**, and incompatible with the fact-specific nature of these cases.

As I would affirm the order denying suppression, I next turn to Appellant's final issue on appeal. Therein, he challenges his conviction for carrying a firearm without a license where the underlying traffic violation was dismissed prior to trial. **See** Appellant's brief at 15. Critically, Appellant presents no argument whatsoever in support of this issue, instead merely reciting portions of the suppression hearing where the patrolmen testified that they did not observe additional illegal activity beyond the Vehicle Code violation. **See id**. at 15-17. Accordingly, I would find this issue waived. **See Commonwealth v. Freeman**, 128 A.3d 1231, 1249 (Pa.Super. 2015) ("The failure to develop an adequate argument in an appellate brief may result in

waiver of the claim under Pa.R.A.P. 2119." (cleaned up)). Notwithstanding waiver, I simply fail to see how the Vehicle Code violation bears any relation to the elements of carrying a firearm without a license.

Discerning no reason to disturb Appellant's judgment of sentence or conviction, I would affirm. Therefore, I respectfully dissent.