J-S42021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JESSICA AMBER FROEHLICH | : | No. 606 WDA 2022 |

Appeal from the Suppression Order Entered April 22, 2022
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0002135-2021

BEFORE:   BOWES, J., OLSON, J., and COLINS, J.[*]

DISSENTING MEMORANDUM BY BOWES, J.:   **FILED: December 22, 2023**

I agree with the learned majority that the patrolmen in this case were permitted to seize the firearm from Appellee.  However, since I cannot agree that our case law requires law enforcement officers who are investigating illegal activity to return firearms without checking the owner's licensure status in a manner that does not prolong a valid traffic stop, I respectfully dissent.

I begin with an overview of the relevant precedent.  In **Rodriguez v. United States**, 575 U.S. 348, 350 (2015), the Supreme Court of the United States was presented with "the question [of] whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop."   In considering this question, the Court outlined the parameters of police authority during traffic stops:

---

[*] Retired Senior Judge assigned to the Superior Court.

> A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called **Terry v. Ohio**, 392 U.S. 1 (1968), stop than to a formal arrest. Like a **Terry** stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.
>
> . . . .
>
> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Id*. at 354-55 (cleaned up).

The **Rodriguez** Court distinguished these mission-related purposes with the dog sniff at issue in that case, which it classified as "a measure aimed at detecting evidence of ordinary criminal wrongdoing" and therefore "not fairly characterized as part of the officer's mission" during a traffic stop. *Id*. at 355-56 (cleaned up). It also distinguished the dog sniff from the "[h]ighway and officer safety" concerns "stem[ming] from the mission of the stop itself" that may require an officer "to take certain negligibly burdensome precautions in order to complete his mission safely." *Id*. at 356-57 (cleaned up). Ultimately, the Court reasoned that the dog sniff could not be justified on the same basis

as an order to exit the car, even if the levels of intrusion were identical. *Id*.

Rather, the Court determined that "[t]he critical question, then, is not whether

the dog sniff occurs before or after the officer issues a ticket, . . . but whether

conducting the sniff prolongs—*i.e.,* adds time to—the stop." *Id*. at 357

(cleaned up). Thus, the Court held as follows:

> [A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.

*Id*. at 350-51 (cleaned up).

Thereafter, in **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019), our

Supreme Court overturned a longstanding rule, first announced by this Court

in **Commonwealth v. Robinson**, 600 A.2d 957, 959 (Pa.Super. 1991), that

"'possession of a concealed firearm by an individual in public is sufficient to

create a reasonable suspicion that the individual may be dangerous, such that

an officer can approach the individual and briefly detain him in order to

investigate whether the person is properly licensed.'" **Hicks**, *supra* at 921

(quoting **Robinson**, *supra* at 959). In that case, Hicks was not engaged in

any illegal activity, but was merely viewed with a firearm.[1] The High Court

---

[1] Respectfully, I disagree with the majority's conclusion that Appellee "stood in the same position" as Hicks "[i]n all material respects." Majority at 22. The police engaged with Hicks **solely** on the basis that he was seen with a firearm and there was a presumption, at that time, that possession was illegal until proven otherwise. Here, however, the police engaged with Appellee because she was a passenger in a vehicle that was properly stopped in a high crime

*(Footnote Continued Next Page)*

noted that "an individual licensed to carry a firearm may do so in public, openly or concealed, within a vehicle or without, throughout every municipality in Pennsylvania." *Id*. at 926. It also expressly rejected the Commonwealth's position that police officers were "duty bound to seize and investigate the licensing status of every individual who carries a concealed firearm in Pennsylvania." *Id*. at 932 (cleaned up). The Court explained that it was overruling **Robinson** because that "holding facially contravene[d] established law . . ., demand[ed] no suspicion of criminal activity—let alone individualized suspicion—and countenance[d] a sweeping and unjustified expansion of the authority of law enforcement to seize persons upon the basis of conduct that, standing alone, an officer cannot reasonably suspect to be criminal." **Hicks**, **supra** at 947.

Subsequently, this Court decided **Commonwealth v. Malloy**, 257 A.3d 142 (Pa.Super. 2021). In **Malloy**, an officer stopped a vehicle based upon the improper placement of a license plate. Malloy was a passenger in the vehicle. When asked for identification, Malloy produced a lanyard, which the

---

area in the middle of the night. Accordingly, I do not find the facts in **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019), analogous to this case.

The majority also likens the instant matter to **Commonwealth v. Kemp**, 961 A.2d 1247 (Pa.Super. 2008). **See** Majority at 23. Our discussion in **Kemp** involved whether "facts gathered during a valid traffic stop can. . . be utilized to justify an investigatory detention occurring after a police officer has indicated that a defendant is free to leave." **Kemp**, **supra** at 1260 (cleaned up). Accordingly, I find **Kemp** distinguishable as the present case did not involve escalating phases of interaction. Instead, all of the police conduct at issue occurred during the initial, valid, traffic stop.

officer associated with an individual working as an armed security guard, and therefore the officer asked whether he had a firearm. Malloy responded affirmatively that the firearm was located on his hip. For safety, the officer asked him to exit the vehicle so he could secure the firearm, and then asked him for his firearms credentials. During the ensuing fifteen to twenty minutes, the officer conducted various checks with local detectives and the Pennsylvania State Police to determine whether Malloy had a valid license to carry. He was arrested after they determined that he did not. *Id*. at 145-46.

In denying suppression in *Malloy*, the trial court first concluded that, pursuant to *Rodriguez*, the checks run by the officer during the traffic stop were permissible. This Court rejected that conclusion:

> [N]either the trial court nor the Commonwealth cite legal authority which equates an investigation of a passenger's documented authority to carry a firearm to the incidental inquiries permitted during a lawful traffic stop under *Rodriguez* and which promote safe and financially responsible operation of motor vehicles. More tellingly, neither the trial court nor the Commonwealth offer any explanation as to how or why a passenger's firearms licensure status relates to these incidental inquiries or, more broadly, to the safe and financially responsible operation of a motor vehicle in general. We are convinced that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured. As such, we reject the trial court's conclusion that [the officer's] request for [Malloy's] documented firearms authorization could be pursued as incidental to the traffic stop herein.
>
> We also reject the suggestion that [the officer's] request fell within the limited class of minimally intrusive and permitted demands police officers may make, out of concern for officer safety and without independent justification, during the course of a lawful

- 5 -

traffic stop. [Malloy] forwards no claim that [the officer] lacked authority to ask for identification, to inquire about the presence of weapons, to request that Appellant exit the vehicle, or to demand that [he] surrender his firearm for the duration of the stop. Moreover, our reading of the transcript reveals that [the officer] secured [the] firearm without incident before requesting that [Malloy] produce documentation that the firearm was lawfully in his possession. [The] seizure of the firearm essentially eliminated any immediate risk the weapon posed to law enforcement personnel, bystanders, and occupants of the vehicle for the duration of the stop and transformed the officer's pursuit of [Malloy's] firearms credentials into an inquiry exclusively aimed at collecting evidence of collateral wrongdoing. *See Rodriguez*, 575 U.S. at 355. Put differently, once [the officer] secured the firearm, [Malloy's] legal authority to own or possess a gun clearly bore no discernible relationship to individual safety or security within the context of the traffic stop. Under these circumstances, where seizure of a firearm has substantially diminished the risk to officers and others who may be present during a lawful vehicle detention, we see no reason why the Fourth Amendment, in the absence of independent justification, suspicion, or cause, should tolerate even a 10- to 15-minute extension of a routine traffic stop for the investigation of a secondary criminal matter. Hence, the request challenged in this case does not fall within the category of actions the police may undertake during a lawful traffic stop based solely on concerns for safety and security and without independent justification or cause.

*Malloy*, *supra* at 152-53 (cleaned up).

Finally, I find guidance from this Court's recent decision in *Commonwealth v. Ross*, 297 A.3d 787, 792 (Pa.Super. 2023). Ross was pulled over for driving with an inoperable brake light. In running his license and registration, the officer learned that, while there were no problems with either of those, his license to carry a firearm had been revoked. Before returning his license, the officer asked Ross whether he had a firearm, to which he replied in the affirmative. The officers secured the firearm and arrested

- 6 -

Ross. The entire stop lasted approximately ten minutes. *Id*. at 790. The trial court ultimately granted Ross's motion to suppress, concluding that the questioning exceeded the scope of the traffic stop and extended the reasonable time needed to issue a traffic citation. *Id*. at 794-95.

Upon review, this Court disagreed with the trial court. We observed that "the constitutionality of mission-specific questions, including those related to the safety of the officer, during a traffic stop, and the determination of . . . when tasks tied to the traffic stop are completed or reasonably should have been completed, is fact specific." *Id*. at 798. In ***Ross***, that fact-specific analysis resulted in a conclusion that "the valid traffic stop was ongoing at the time [the officer] asked whether Ross possessed a firearm because he had not concluded the stop with a warning or citation or indicated that Ross could leave." *Id*. at 795 (cleaned up). Additionally, we held that the officer "in no way unnecessarily prolonged the stop, as he completed his routine check of the various databases and asked the question after he walked back to Ross's vehicle while holding Ross's license." *Id*. (cleaned up). Since the stop was still ongoing, the officer was permitted to inquire about the presence of firearms. *Id*.

As to the officer's safety concerns, we observed that "the interest in the safety of law enforcement officers outweighs the *de minimus* intrusion to the individual who is asked to step outside a lawfully stopped motor vehicle[, and] the asking of an additional question or two about a firearm was less intrusive

than the order to exit the vehicle[.]" *Id*. at 796-97 (cleaned up). Indeed, this Court elaborated on officer safety concerns during traffic stops:

> It bears emphasizing that balancing the constitutional rights of motorists, the public protection objectives, and police officer safety is difficult, especially in the context of rapidly evolving traffic stops. One particular concern for officers during a traffic stop is the proliferation of guns, including the substantial increase in the number of people possessing firearms, the rise in mass shootings, and the ability to carry a concealed weapon in vehicles in Pennsylvania. Clearly, neither the United States Constitution nor the Pennsylvania Constitution require officers to gamble with their personal safety during traffic stops. Therefore, in the context of traffic stops, police officers may take reasonable precautions when the circumstances give rise to legitimate safety concerns.

*Id*. at 797–98.

The **Ross** Court distinguished Ross's scenario from that in **Malloy**, focusing on the fact that the officer's safety in **Malloy** was secured by the seizure of the firearm, and therefore the subsequent inquiry into Malloy's licensure status was improper. **Ross**, **supra** at 797.

In light of the foregoing precedent, I find it appropriate to apply a fact-specific test to determine whether the permit check ran afoul of Appellee's constitutional rights. In this case, the traffic stop occurred at approximately 2:30 a.m. in a high crime area known for "shots fired." **See** N.T. Hearing, 12/14/21, at 6, 12-13, 31. In addition, the vehicle was known to the police for being involved in prior incidents. *Id*. at 36. On that night, the vehicle was stopped by two patrolmen because the vehicle's license plate was expired. *Id*. at 5. There were three individuals in the vehicle, a female driver, a female front-seat passenger, and Appellee, seated in the rear. *Id*. at 6. As the

patrolmen spoke to the three occupants, one of them observed a firearm in the back pocket of the front passenger's seat, directly in front of Appellee. *Id*. at 9. Upon inquiry, Appellee acknowledged that the firearm was hers. *Id*. at 10. One patrolman seized the firearm and rendered it safe for the remainder of the traffic stop, while the other asked Appellee whether she had a firearm permit. *Id*. at 10, 26-27. Appellee stated that she did, but not with her. *Id*. at 27-28. Therefore, the patrolmen ran through dispatch the driver's licenses of both the driver and Appellee and checked the status of the firearm. *Id*. at 28-29. As a result, the patrolmen determined that Appellee's conceal-carry permit had been revoked. *Id*. at 12. The entire traffic stop lasted less than eleven minutes. *Id*. at 13-14, 31.

Unlike in *Malloy*, the firearm at issue was immediately visible to the police officers and the traffic stop here was not prolonged by the ensuing permit check. Rather, as in *Ross*, my review of the certified record confirms that the traffic stop remained ongoing at the time the patrolmen checked the permit status. During the eleven-minute stop, the patrolmen ran multiple checks simultaneously to ascertain the status of: (1) the driver of the vehicle's driver's license; (2) Appellee's concealed-carry permit; and (3) whether the firearm was stolen. *See* N.T. Hearing, 12/14/21, at 28, 37.

Our case law clearly permits police to check the status of a driver's license and ask passengers for identification. *See Rodriguez*, *supra* at 355; *Commonwealth v. Campbell*, 862 A.2d 659, 665 (Pa.Super. 2004).

Moreover, our Court has discerned no violation where a police officer ran a passenger's identification through the system to check for outstanding warrants. **See Commonwealth v. Galloway**, 265 A.3d 810, 816-17 (Pa.Super. 2021) (observing, without concern, that the officer had taken the passenger's identification information and ran it for warrants during the traffic stop, and the results of that check formed, in part, the basis for an extension of the stop to ask the passenger additional questions). Finally, we have held:

> It would be incongruous to permit an officer to order the driver out of his vehicle pursuant to a lawful stop in order to diminish the likelihood that the officer will be attacked with a concealed weapon, but not permit the officer to order the passengers out of a lawfully stopped vehicle, when those passengers present the same risk of attack and have the same access to concealed weapons.

**Commonwealth v. Brown**, 654 A.2d 1096, 1102-03 (Pa.Super. 1995) (cleaned up).

In all, Appellee was advised that her permit was invalid ten minutes and thirty seconds into the traffic stop, before the reason for the stop had expired. **Id**. at 11, 31. Based on the foregoing authority, and finding that there was no unreasonable extension of the valid traffic stop in this case, I would conclude that the patrolmen's actions did not run afoul of our case law and do not warrant suppression. **See Ross**, **supra** at 798 ("Because we conclude that the concerns for the safety of the officers justified the proportional intrusion on Ross, the motion to suppress should have been denied."); **Rodriguez**, **supra** at 350-51 ("[A] police stop exceeding the time needed to

handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." (cleaned up)).

While I find this matter factually distinguishable from *Malloy* and would reverse on that basis, I must admit to being troubled by the holding in *Malloy*. While it concedes that the safety risks of a traffic stop are secured by the seizure of a firearm, it then demands that the firearm must, at some point, be returned by the officers before the safety concerns can be fully addressed. Respectfully, I believe such a rule to be untenable. Practically speaking, to suggest that an officer cannot explore the legality of the possession of a firearm seized during a valid traffic stop for safety begs the question: are they just supposed to give it back to the individual when the stop is concluded without ascertaining whether the owner is entitled to possess it? Surely if officer safety permits the intrusive action of seizing the firearm, the same safety concerns must allow the unintrusive act of extending the valid stop for a minimal amount of time to ensure the officers are not re-arming someone barred from carrying a firearm while the officers remain vulnerable.

Contrary to the Majority's characterization, I am not "avoid[ing] suppression by raising claims of police policy." Majority at 21. I believe it prudent to consider the practical applications of our holdings and, accordingly,

- 11 -

deem it our duty to consider what police officers can and cannot do in situations like the one presently before us. To that end, I observe that an inquiry into the legality of a firearm seized during a valid traffic stop can readily be completed in a timely manner that does not prolong the stop. If it does prolong the stop unreasonably, then it runs afoul of **Rodriguez** and suppression may be warranted.[2] Where it does not, however, **Rodriguez** instructs that "negligibly burdensome precautions" must be permitted. **Rodriguez**, **supra** at 356. Otherwise, we are left with caselaw that permits officers to inquire about firearms during traffic stops and to seize any firearms temporarily for officer safety but prohibits them from determining whether the owner of the firearm may lawfully possess it before returning it at the conclusion of the stop.

Thus, pursuant to **Malloy**, an officer conducting a traffic stop where a firearm is present is faced with a no-win scenario. If she decides to run a firearm permit check during a valid traffic stop without prolonging the interaction, she nonetheless risks the possibility of suppression of any

---

[2] To be clear, I do not agree with the Commonwealth's position that police are duty-bound to investigate the licensure status of every individual encountered who happens to be in possession of a firearm. **See** Majority at 25 (ascribing to me the "radical position" that the Commonwealth contended, requiring police "to seize and investigate the licensing status of every individual who carries a concealed firearm in Pennsylvania" (cleaned up)). As I already explained, our Supreme Court expressly rejected that position in **Hicks**, **supra** at 932, and I have taken that holding into consideration in applying the relevant precedent to the facts presently before this Court in this case.

contraband discovered thereafter. On the other hand, if the officer decides not to run a check, she risks her safety by potentially returning a firearm to an individual who may have had their license to carry revoked for wrongdoing and who has every incentive to avoid being arrested for the firearm violation. I find this *non sequitur* troubling as it is an overextension of the holdings in **Rodriguez** and **Hicks**, and incompatible with the fact-specific nature of these cases.

As I would reverse the order and remand for further proceedings for these reasons, I must respectfully lodge this dissent.