J-S28005-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRYAN CRABTREE | : | |
| | : | |
| Appellant | : | No. 2801 EDA 2023 |

Appeal from the Judgment of Sentence Entered October 9, 2023
In the Court of Common Pleas of Delaware County
Criminal Division at No:  CP-23-CR-0002614-2022

BEFORE:  STABILE, J., MURRAY, J., and LANE, J.

MEMORANDUM BY STABILE, J.:                    **FILED FEBRUARY 21, 2025**

Appellant, Bryan Crabtree, appeals from the judgment of sentence for drug-related convictions entered in the Court of Common Pleas of Delaware County on October 9, 2023.  Appellant argues that the trial court erred in not granting his motion to suppress.  We agree.  Accordingly, we vacate Appellant's judgment of sentence, reverse the order denying suppression, and remand to the trial court for proceedings consistent with this decision.

The trial court summarized the relevant factual and procedural background as follows.

> Appellant was arrested on December 24, 2021 following a traffic stop in Ridley Township, Delaware County.  He was charged with possession of a controlled substance and possession of drug paraphernalia. On May 3, 2023, Appellant filed a Motion to Suppress seeking suppression of physical evidence alleging there was no reasonable suspicion or probable cause to stop, detain, frisk, or search his person, vehicle, or bag.  A hearing was held on the suppression motion on June 29, 2023.

Trial Court Opinion, 12/5/23, at 1.

Following the hearing, the court made the following findings of fact:

- Officer Eisenhuth is a patrol officer with the Ridley Township Police Department and had served in that capacity for three years prior to the date of this incident.

- On December 24, 2021, the police received multiple calls regarding vehicles driving down the wrong way on Amosland Road.

- Officer Eisenhuth observed a silver vehicle travelling down that road and initiated a traffic stop.

- Before Officer Eisenhuth approached the vehicle, the driver, [Appellant]'s father, exited the vehicle. This [was] abnormal according to the officer[,] who stated people usually remain in the vehicle and that is preferred to maintain control of the situation and maintain safety.

- The driver gave his license to Officer Eisenhuth and told her it was suspended. The officer then asked if [Appellant]/passenger had a license, but he did not.

- Officer Eisenhuth planned to permit the occupants of the vehicle to find someone to come get the vehicle after she issued a warning. However, when she went back to her vehicle to run the driver's license through NCIC, the driver fled on foot.

- Officer Eisenhuth was then on high alert and concerned for her safety, wondering if [the] driver fled because there was something dangerous in the vehicle.

- The officer then asked the passenger to step outside the vehicle. He did so and brought his bag with him.

- Once [Appellant] was at the rear of his vehicle, he was asked to take his hands out of his jacket pocket. He complied but then put his hands back in his pocket. The jacket pocket was large enough to fit a firearm.

- [Appellant's] actions raised concerns for officer safety as Officer Eisenhuth had a prior experience where a defendant had his hands in his pocket and was concealing a firearm there.

- Based on the driver running away, the fact that she was alone, and [Appellant] putting his hand back in his jacket pocket, Officer Eisenhuth [attempted to conduct a pat down] of [Appellant].

- During the pat down,[1] [Appellant] was asked not to put his hands in his pocket but reached for his pocket three times. It was at that point that the officer placed [Appellant] in handcuffs to detain him until she was able to gain control of the situation and ensure safety.

- She then placed her hands in his jacket pocket and retrieved a Ziploc bag containing marijuana.

- After [Appellant] was arrested, his bag was searched revealing parchment paper, drugs, and paraphernalia.

- The vehicle was towed.

Trial Court's Findings of Fact, 8/18/3, at 1-3 (citations to record omitted).

On August 18, 2023, the trial court denied the suppression motion. The case proceeded to a bench trial wherein Appellant was found guilty of both charges. This appeal followed.

_____

[1] The phrase "during the pat down" does not fully capture the chain of events. Findings of Facts, 8/18/23, at 3. The officer testified that she "started doing a pat down" of Appellant's waistband, but when Appellant tried to reach for the pocket again, she handcuffed Appellant and "went into his pocket." N.T. Suppression Hearing, 6/29/23, at 17, 29. The officer admitted that she did not recall whether she patted down Appellant's pocket before reaching inside. *Id.* at 29. The record, therefore, reveals that the officer began, but did not complete the pat down due to Appellant's repeated attempts to reach his pocket.

Appellant raises the following questions for our review:

1. Whether the trial court erred by denying [A]ppellant's motion to suppress physical evidence where [A]ppellant was seized in the absence of specific, articulable facts to support a reasonable suspicion that he was engaged in criminal activity[.]

2. Whether the trial court erred by denying [A]ppellant's motion to suppress physical evidence where [A]ppellant was frisked in the absence of specific, articulable facts to support a reasonable suspicion that he was armed and dangerous, and the search exceeded the scope of a permissible ***Terry***[2] frisk[.]

3. Whether the trial court erred by denying [A]ppellant's motion to suppress physical evidence where the search of [A]ppellant's bag was not a valid search incident to arrest, nor a lawful extension of the ***Terry*** frisk, but was the fruit of the unlawful search?

Appellant's Brief at 4.

In reviewing the denial of a suppression motion, we are limited to determining

> whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Thus, our review of questions of law is *de novo*. Our scope of review is to consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole.

***Commonwealth v. Shaffer***, 209 A.3d 957, 968-69 (Pa. 2019) (citations omitted). Where, as here, the issue on appeal relates solely to a suppression ruling, we examine "only the suppression hearing record" and exclude from

_____

[2] ***Terry v. Ohio***, 392 U.S. 1 (1968).

consideration "evidence elicited at trial." ***In the Interest of L.J***., 79 A.3d

1073, 1085 (Pa. 2013).

The Fourth Amendment to the United States Constitution, incorporated

in the states by and through the Fourteenth Amendment to the United States

Constitution, protects citizens from "unreasonable searches and seizures." It

provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.[3]  Generally, for a search or seizure to be reasonable

under the Fourth Amendment, police officers must obtain a warrant before

conducting the search or seizure.  A search or seizure without a warrant "is

presumptively unreasonable . . . subject to a few specifically established, well-

delineated exceptions." ***Commonwealth v. Chase***, 960 A.2d 108, 113 (Pa.

2008).  The present appeal involves the investigatory detention exception,

commonly referred to as the ***Terry*** doctrine.

A ***Terry*** stop permits an officer to briefly detain a citizen for

investigatory purposes if the officer has "reasonable suspicion based upon

specific and articulable facts, that criminal activity is afoot." ***Commonwealth***

---

[3] Article I, § 8 of the Pennsylvania Constitution also provides protection against unreasonable searches and seizures, but Appellant does not seek relief under Article I, § 8 in this appeal.

*v. Carver*, 318 A.3d 386, 390 (Pa. Super. 2024). Generally, a motor vehicle stop is an investigative detention. ***See Commonwealth v. Spence***, 290 A.3d 301, 314 (Pa. Super. 2023). "[A]n investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest." ***Id.*** However, "[s]ince this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." ***Id.***

At any point during this investigatory detention, if an officer "believes, based on specific and articulable facts, that the individual is armed and dangerous," ***Terry*** authorizes the officer to frisk the suspect's outer clothing. ***Carver***, 318 A.3d at 390; ***Terry***, 392 U.S. at 30. The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence. ***Carver***, 318 A.3d at 390. The officer "need not be absolutely certain that the individual is armed"; rather, the appropriate standard is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." ***Terry***, 392 U.S. at 27. "If a police officer conducting a lawful ***Terry*** frisk detects an object within a suspect's clothing, . . . a police officer may remove an object from within a suspect's clothing under the reasonable suspicion that the object is a weapon" or "if, by touch, it is immediately

- 6 -

apparent that the object is illegal contraband." *Interest of T.W.*, 261 A.3d 409, 422 (Pa. 2021).

As a general matter, where evidence has been obtained by police during an unlawful search or seizure in violation of the Fourth Amendment, the evidence must be excluded, and "the fruit of the poisonous tree doctrine extends the exclusionary rule to render evidence inadmissible which was derived from the initially illegally obtained evidence." *Commonwealth v. Ani*, 293 A.3d 704, 731 (Pa. Super. 2023) (quoting *Commonwealth v. Santiago*, 209 A.3d 912, 916 n.4 (Pa. 2019)).

With this backdrop, we turn to the arguments in Appellant's brief. In his first argument, Appellant contends that the police were not justified in continuing to detain him after the driver of the vehicle fled. Appellant was the passenger in a car that was stopped for driving the wrong way on a one-way street. According to Appellant, since the stop was for a moving violation, the purpose of the stop was to enforce the Motor Vehicle Code. Thus, when the person who committed the violation (the driver) fled, the justification for stopping Appellant ended. Officer Eisenhuth could not prolong Appellant's detention, Appellant continues, because the mere fact that he was in the presence of a person who ran away did not create reasonable suspicion that Appellant was involved in criminal activity. Thus, his continued detention was unlawful, and the evidence seized from his pocket and backpack were the

fruits of an unlawful seizure that should have been suppressed. Appellant's Brief at 10-13.

This argument is not supported by the facts or the law. As noted above, neither the driver nor Appellant had a valid driver's license, which meant that they could not drive their vehicle once the traffic stop was completed. The officer, therefore, gave them the opportunity to figure out arrangements for the vehicle. The officer then walked to her cruiser to run a NCIC check. While she was running that check, the driver fled. Thus, the original traffic stop was not concluded when the driver fled, because the officer was still running an NCIC search.

Furthermore, it is well-settled that during a traffic stop, an officer may "request both drivers and their passengers to alight from a lawfully stopped car without reasonable suspicion that criminal activity is afoot." *Commonwealth v. Brown*, 654 A.2d 1096, 1102 (Pa. Super. 1995); *see also Commonwealth v. Rodriguez*, 695 A.2d 864, 868-69 (Pa. Super. 1997) (same); *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019) (to effectuate officer safety, during "a lawful traffic stop, the officer may order the driver of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot") (citation, ellipses, and brackets omitted). The reason for this rule is that "traffic stops are especially fraught with danger to police officers." *Commonwealth v. Ross*, 297 A.3d 787, 792 (Pa. Super. 2023). "[A]llowing

police officers to control all movement in a traffic encounter . . . is a reasonable and justifiable step towards protecting their safety." **Id.** at 793. Thus, the trial court correctly ruled that Officer Eisenhuth had the authority to request Appellant to step outside the vehicle.

Citing **Commonwealth v. Peterson**, 17 A.3d 935 (Pa. Super. 2011), and **Commonwealth v. Espada**, 528 A.2d 968 (Pa. Super. 1987), Appellant argues that "police must consider the subject's own actions, not the actions of the person or people who they are with."[4] Appellant's Brief at 13. Appellant's reliance on these decisions is misplaced because they did not involve traffic stops, which, as discussed above, are especially perilous for police officers. Officer Eisenhuth had the authority to direct Appellant to exit the vehicle to protect the officer's safety during this traffic stop.

In his second and third arguments, which we review together, Appellant challenges the lawfulness of the search of his pocket. Appellant

---

[4] In **Peterson**, the defendant was standing on the corner with six other men. When the police approached, the six men fled, but appellee remained behind. The Commonwealth argued that the unprovoked flight of the six other individuals, combined with the time of day, 12:30 a.m., and the high rate of crime in the area created reasonable suspicion that the defendant was engaged in criminal activity. We disagreed, noting that "[w]hile the officer may have had reasonable suspicion to detain the individuals who fled, the fact that a person did not take flight cannot give rise to reasonable suspicion that he is engaged in illegal conduct." **Peterson**, 17 A.3d at 938; **see also Espada**, 528 A.2d at 971 (no reasonable suspicion existed for **Terry** stop of defendant who merely was on corner with others in high crime area and walked toward police car when summoned).

contends that (1) Officer Eisenhuth did not have reasonable suspicion to believe that Appellant was armed and dangerous, (2) the search of his pocket exceeded the scope of what is permissible under **Terry**, and (3) the physical evidence from this search should have been suppressed. The Commonwealth responds that the officer was justified in believing a frisk was warranted, but it concedes that skipping the frisk and proceeding directly to a search was "problematic." Commonwealth Brief at 15. The Commonwealth further concedes that the evidence recovered from Appellant's pocket should have been suppressed. **Id.** at 17-18.

As discussed above, **Terry** establishes that when an officer believes, based on specific and articulable facts, that the individual is armed and dangerous, she may frisk the suspect's outer clothing. A decision issued on the same day as **Terry**, **Sibron v. New York**, 392 U.S. 40 (1968), held that an officer violated the defendant's Fourth Amendment rights by searching his pocket without first frisking his outer clothing. The officer observed Sibron "talking to a number of known narcotics addicts over a period of eight hours." **Id.** at 62. He then approached Sibron in a restaurant and "told him to come outside." **Id.** at 45. Once outside, he said to Sibron, "You know what I am after." **Id.** Sibron reached into his pocket, and the officer "thrust his hand into the same pocket, discovering several glassine envelopes, which, it turned out, contained heroin." **Id.** The Court concluded that with the meager information the officer had about Sibron, there were no reasonable grounds

to suspect him of a crime. *Id.* at 62–63. Since the officer did not claim that he thought Sibron was reaching for a weapon, the Court concluded that there was no justification to conduct a protective search for weapons. *Id.* at 64 & n.21.

The Court continued that "[e]ven assuming arguendo that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by [the officer] were so clearly unrelated to that justification as to render the heroin inadmissible." *Id.* at 65. The Court explained that the "search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault," and it was only after feeling such weapons that the officer in *Terry* "place[d] his hands in the pockets of the men he searched." *Id.* By contrast, the officer in *Sibron* made "no attempt at an initial limited exploration for arms" but simply "thrust his hand into Sibron's pocket and took from him envelopes of heroin." *Id.* As a result, "[t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id.* The search of Sibron's pocket "violate[d] the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents." *Id.* at 65–66. As a result, the Supreme Court ordered suppression of the heroin.

While *Sibron* establishes the general principle that an officer should frisk the suspect's outer clothing during a *Terry* stop before conducting a more invasive search, there are several circumstances in which courts will excuse the absence of a frisk. For example, in *Adams v. Williams*, 407 U.S. 143 (1972), a reliable informant advised an officer that an individual seated in a car located in a high crime area at 2:15 a.m., was carrying narcotics, and had a gun at his waist. The officer approached the car and asked the suspect to step out. When the suspect disobeyed and merely rolled down his car window, the officer immediately reached through the window and removed an unseen gun from the suspect's waistband. In approving the officer's actions, the Supreme Court explained:

> While properly investigating the activity of a person who was reported to be carrying narcotics and a concealed weapon and who was sitting alone in a car in a high-crime area at 2:15 in the morning, Sgt. Connolly had ample reason to fear for his safety. When Williams rolled down his window, rather than complying with the policeman's request to step out of the car so that his movements could more easily be seen, the revolver allegedly at Williams' waist became an even greater threat. Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable.

*Id.*, 407 U.S. at 147–48. This Court has analyzed *Adams* as follows:

> We believe that a preliminary pat-down or frisk was excused by the Court in *Adams* [] for two reasons. First, the investigating officer had reliable information that the suspect was carrying a concealed weapon in his waistband. Second, and more importantly, the suspect's failure to comply with the officer's request to exit the car, prevented the officer from performing a frisk or pat-down without placing himself in a much more

dangerous position in relation to the suspect. *See* W.R. LaFave, SEARCH AND SEIZURE A TREATISE ON THE FOURTH AMENDMENT, Section 9.4, p. 125 (1978). Thus[,] it is settled that, under appropriate circumstances, an investigating officer may dispense with a preliminary frisk and conduct an immediate search.

*Commonwealth v. Cavalieri*, 485 A.2d 790, 793 (Pa. Super. 1984).[5]

In the present case, after the driver fled from the scene of the traffic stop, Officer Eisenhuth was alone with Appellant throughout the ensuing interaction. The officer approached the vehicle and asked Appellant to exit. Appellant complied. As he was exiting the vehicle, the officer asked Appellant to remove his hands from his pocket, which was big enough to conceal a weapon. At first, he complied, but he soon put his hands back into his jacket pocket. The officer again asked Appellant to remove his hands from his pocket. Appellant complied, but then he tried again to put his hands back in his pocket. The officer also testified that, based on her experience, when a person nervously "keeps going back to a certain area," "it is typically an indication that they are concealing something illicit." N.T. Suppression Hearing, 6/29/23, at 16-17. The officer decided to perform a pat down. She

_____

[5] This Court also has excused the lack of a pat down when the suspect makes threatening movements, such as thrusting a metallic object into his waistband, *see Commonwealth v. Brown*, 335 A.2d 782, 783 (Pa. Super. 1975), or responds to police presence by turning to face an officer with his hand in his pocket, *see Commonwealth v. Zhahir*, 751 A.2d 1153, 1158 (Pa. 2000). Another circumstance might be when the suspect "makes a sudden move to his pocket notwithstanding a police order to keep his hands in plain view." LaFave, Search and Seizure, at § 9.6(b) & n. 262 (collecting cases).

testified, "I started doing a pat-down, where he then again tried to reach for the pocket. At that point then, I placed him in handcuffs and then went into his pocket, which I discovered the Ziplock baggies." *Id.* at 17.

Officer Eisenhuth had the authority to frisk Appellant under these circumstances. *See Commonwealth v. Thomas*, 179 A.3d 77, 83-84 (Pa. Super. 2018) (defendant's "refusal to comply with [officer's] request to remove his hands from his pockets justified the frisk of his person for the protection of the officers," and "[i]t was reasonable for [the officer] to infer that [the defendant] may have been armed and dangerous, given his refusal to show his hands and his evasive movements"); *see also Commonwealth v. Hall*, 713 A.2d 650, 653 (Pa. Super. 1998), *reversed on other grounds*, 771 A.2d 1232 (Pa. 2001) ("when Hall approached with his hand thrust in his pocket and refused to remove it, the encounter escalated into a situation where the totality of circumstances involved a reasonable suspicion and justified a detention to stop and frisk"); *Commonwealth v. Scarborough*, 89 A.3d 679, 684 (Pa. Super. 2014) ("Thus, in *Hall*, the single factor of the defendant keeping his hand in his pocket after being asked to remove it escalated the encounter into one of reasonable suspicion," justifying a detention to stop and frisk).[6]

_____

[6] While not specifically raised as an issue for our review, the officer had the authority to handcuff Appellant during a *Terry* frisk. *See Spence*, 290 A.3d 301 at 314 ("For their safety, police officers may handcuff individuals during
*(Footnote Continued Next Page)*

The problem in this case, however, is that while Officer Eisenhuth began a frisk, she searched Appellant's pocket without finishing the frisk. As the Commonwealth concedes, this conduct fell outside constitutional bounds. During a lawful investigative detention, an officer who reasonably suspects that a suspect is armed and dangerous may conduct a frisk of the suspect's outer clothing. If the officer detects an object within the suspect's clothing during a lawful *Terry* frisk, she may remove the object if she reasonably believes that the object is a weapon or if, by touch, it is immediately apparent that the object is illegal contraband. *Interest of T.W.*, 261 A.3d at 422. Here, the officer did not complete the frisk—and in particular, she did not frisk Appellant's pocket before searching the pocket and seizing the item within. Nor did any circumstances excuse the absence of a frisk. Unlike *Adams*, Officer Eisenhuth did not have a reliable tip that Appellant was carrying a concealed weapon. Moreover, at the time she searched Appellant's pocket, Appellant could not retrieve any item from his pocket because he was handcuffed, so frisking Appellant would not have posed any danger to the officer's safety. Thus, we are constrained to conclude that the officer's search of Appellant's pocket "was not reasonably limited in scope to the

_____

an investigative detention"); *Commonwealth v. Rosas*, 875 A.2d 341, 347–48 (Pa. Super. 2005), *appeal denied*, 897 A.2d 455 (Pa. 2006) (same); *Commonwealth v. Guillespie*, 745 A.2d 654, 660-61 (Pa. Super. 2000) (handcuffing suspect "was merely part and parcel of ensuring the safe detaining of individuals during the lawful *Terry* stop" and did not constitute an arrest).

accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Sibron*, 392 U.S. at 65.

The illegal pocket search, which formed the basis to arrest Appellant, tainted the subsequent search of Appellant's bag conducted incident to his arrest. Accordingly, we conclude that the evidence seized from the search of Appellant's pocket, the bag of marijuana, as well as the evidence seized from his bag, must be suppressed. The trial court erred in denying Appellant's motion to suppress, and the judgment of sentence cannot stand.

Judgment of sentence vacated. Suppression order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/21/2025