**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Tarvus GAINER, Appellant.**

Superior Court of Pennsylvania.

Filed Oct. 13, 2010.

Suzanne M. Swan, Chief Public Defender and Candace S. Seymour, Public Defender, Pittsburgh, for appellant.

Michael W. Streily, Deputy District Attorney and Rebecca G. McBride, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: STEVENS, DONOHUE, and OTT, JJ.

OPINION BY STEVENS, J.:

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Allegheny County following Ap-

pellant's conviction on the charges of carrying a firearm without a license, 18 Pa. C.S.A. § 6106, and possession of a firearm with an altered manufacturer's number, 18 Pa.C.S.A. § 6110.2. Appellant's sole contention is that the evidence was insufficient to sustain his conviction for carrying a firearm without a license under Section 6106 since the Commonwealth failed to prove the firearm was "operable."[1] We affirm.

In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Clark*, 746 A.2d 1128 (Pa.Super.2000) (*en banc*). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Sanders*, 426 Pa.Super. 362, 627 A.2d 183, 185 (1993) (citation omitted). Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. Badman*, 398 Pa.Super. 315, 580 A.2d 1367, 1372 (1990) (citation omitted). "Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa.Super.2004).

The relevant facts are as follows: Appellant was arrested and, represented by counsel, he proceeded to a bench trial on April 2, 2009, at which the sole testifying witnesses were Pittsburgh Police Officer Dan Hartung and Jason Very. Specifically, Officer Hartung testified that, at approximately 8:00 a.m. on July 1, 2008, he was dispatched to the 400 block of 39th Street for a report of "males doing drugs in a white van" near the basketball courts. N.T. 4/2/09 at 8–9. Officer Hartung, who was in full uniform and operating a marked police vehicle, arrived at the location and observed people playing basketball. N.T. 4/2/09 at 9–10. He exited his vehicle with his police dog and walked towards the basketball courts, at which time he made eye contact with Appellant, who turned and walked in the opposite direction away from Officer Hartung towards a line of trees. N.T. 4/2/09 at 10. Officer Hartung observed Appellant carrying a blue bag directly in front of him as if he were trying to conceal it. N.T. 4/2/09 at 11. Officer Hartung anticipated where Appellant would exit the tree line and met Appellant as he walked down a path towards 39th Street. N.T. 4/2/09 at 12. Appellant, who was no longer carrying the blue bag, blurted out, "I don't have anything, you can search me." N.T. 4/2/09 at 13. Officer Hartung waited for back-up officers to arrive and then he walked up the path, finding the blue bag at the top of the path. N.T. 4/2/09 at 13–14. Based on his experience and training, Officer Hartung felt the outside of the thin blue nylon bag and felt what he believed to be a small caliber firearm. N.T. 4/2/09 at 15. He opened the bag and discovered inside a twenty-two caliber semi-automatic firearm with an obliterated serial number.[2] N.T. 4/2/09 at 15. Officer Hartung submitted

---

1. Appellant has presented no argument with regard to his conviction for possession of a firearm with an altered manufacturer's number under Section 6110.2.

2. The parties stipulated that Appellant did not have a license to carry a firearm in Pennsylvania.

the gun to the crime unit and crime laboratory. N.T. 4/2/09 at 26.

Jason Very, who is a firearms examiner for the Allegheny County Medical Examiner's Office,[3] indicated that a twenty-two long rifle caliber Sedco Pistol, SP–22, was submitted to the laboratory on July 10, 2008, with regard to Appellant's case. N.T. 4/3/09 at 34. As to the operability of the gun, the following relevant exchange occurred:

Q: And what type of operating condition was this gun in when you received it?

A: When I received the firearm it was in [an] inoperable condition.

Q: Can you explain just so the record is clear what is an inoperable condition of a firearm, how was it inoperable?

A: The basic condition that I received the pistol in you could not discharge a round. It took a little bit of work to get the firearm to be operable.

Q: But was it eventually made operable?

A: It was, yes.

Q: I'm going to show you what I have marked for identification purposes as Commonwealth's Exhibit No. 3.

[ADA]: Your Honor, may I approach the witness?

THE COURT: You may.

BY [ADA]:

Q: The gun is locked for the safety of everyone?

[DEFENSE COUNSEL]: Your Honor, may I also approach the witness so I can observe.

THE COURT: Of course.

BY [ADA]:

Q: Is this the gun that was submitted to you in regard to this case?

A: Yes, it is.

[ADA]: May I take the lock off that weapon to show you exactly the essential issue in this part of the case?

THE COURT: Yes, just don't point it at me.

[ADA]: With the court's permission may I stand here to show you what I'm talking about when I question him.

THE COURT: Yes. [Defense counsel], you can come up if you like.

[ADA]: I have shown [defense counsel] this situation before.

THE COURT: Okay.

BY [ADA]:

Q: Mr. Very, could you explain for the Judge while showing him right now with my flashlight that I have in my hand, and could you explain what I am pointing at?

A: What you are looking at, Your Honor, is at the twelve o'clock position on the chamber of the pistol here you see a half moon indent circle. What happens with the rim when you fire the pistol, the firing pin is not center—doesn't hit the center of the cartridge. What it does is hits on the rim of the cartridge. So, if there is not a cartridge in the chamber when you dry fire the pistol it will hit on the rim of the chamber. That will cause what we call a burr. It just deforms the metal over time.

When dealing with this particular pistol, like a cheaper alloy, made of softer alloy, so it happens a lot easier than if it was a harder steel.

Q: Was there a burr on this weapon when you received it?

A: Yes, there was a burr on the rim of the chamber that was preventing the cartridge from feeding the magazine

3. The parties stipulated to Mr. Very's expertise. N.T. 4/3/09 at 30, 33.

into the chamber. That is why we state the pistol was inoperable.

THE COURT: If someone had manually placed a cartridge into the chamber would it fire?

THE WITNESS: You physically could not get a cartridge regardless because of the burr.

THE COURT: Okay.

BY [ADA]:

Q: And did you make this firearm operable?

A: I did, yes, I grinded the burr off using a dremel power grinding tool and after that I test fired the weapon, found that it was in good operating condition.

Q: And could you explain for the court the different types of tools you could use in this situation?

A: Yeah, there [are] a few tools. You could use any type of file, anything that was used to grind metal. As I mentioned I used a power tool, just a small handheld grinder but you could also use a manual grinder, manual file, anything like that.

Q: I'm going to show what I have marked as Commonwealth's Exhibit No. 4 and No. 5 for identification purposes. Could you show the Judge what this is, how it works, please?

A: Yeah, this is the actual tool that I used, just a rechargeable battery, cordless handheld dremel, little small grinding tool. I have a bit here that we use on this type of situation to grind something off a circulator surface, basically just turn the power on and let it go.

THE COURT: I have one in my lab.

BY [ADA]:

Q: You used this tool to get the burr off this weapon?

A: Yes, sir.

Q: How long did that take?

A: I would guess less than twenty seconds.

Q: And I show you what I have marked [as] Commonwealth's No. 5. This is so the record is clear[.]

A: A hand file.

Q: And could you use that in this situation in regards to this gun?

A: Yeah, that would definitely work also.

Q: Why didn't you use this as opposed to the power tool?

A: Actually easier, quick, right beside me.

Q: And in your expert opinion could a novice determine what was wrong with this gun just by looking at it?

[DEFENSE COUNSEL]: I would object, calls for speculation, Your Honor.

THE COURT: He is an expert, he can give an opinion on it.

THE WITNESS: If you attempted to chamber a round you would realize right away something was wrong because the cartridge could physically not chamber. You would realize there has to be something blocking that.

To look at it, I don't know if that's the first thing that you would notice but you would know there was something obstructing the cartridge from loading.

BY [ADA]:

Q: From pulling back, I'm sorry, when—what am I pulling back?

A: The slide.

Q: I pull back the slide, am I able to see what was obstructing the cartridge?

A: Yes, I could see it.

Q: And—okay. So a person who is not an expert such as yourself could pull it back and make a determination that something is blocking a cartridge from going into the chamber?

[DEFENSE COUNSEL]: Objection, leading.

THE COURT: Can you rephrase it.

BY [ADA]:

Q: Could a person pulling back the gun to see where the problem was, could a person without any expertise know what the problem was?

A: Well, the burr was definitely visible with the naked eye. I have run across this problem before, right away I knew what the problem was. I don't know if, you know, a layman could look and say oh, that's the burr caused from dry firing. However, it was definitely visible. I could see instead of the chamber being a complete circle, definitely an indent into the chamber.

＊　　　＊　　　＊

*Cross–Examination.*

BY [DEFENSE COUNSEL]:

Q: Mr. Very, you had shown the Judge, myself and the district attorney the location of the burr and you had also stated that it would have prevented a cartridge from chambering, is that correct?

A: Yes.

Q: Could you please try to estimate for the court the percentage of the chamber that would have been blocked, maybe a fraction if you would?

A: It was a very small percentage, five percent of the rim of the chamber maybe.

Q: But in response to the Judge's question as to whether you could hand load a bullet or piece of ammunition, would not have fit into the chamber, is that correct?

A: That's correct, when they designed firearms they design the chamber so tight that when a cartridge is chambered there is absolutely no give at all around it and those—so when the gases,

when the projectile is disbursed it goes forward, gases go forward.

Q: And you described the action that you took to make the firearm operable. You described using the dremel tool?

A: Yes, ma'am.

Q: This is an item—if I may, that is property of the firearms section of the Medical Examiner's Office of the County of Allegheny?

A: Yes, it is.

Q: It isn't something that you normally carry on your person or in your pocket?

A: No, I don't.

Q: It is in your lab?

A: At the lab, yes.

Q: Then we also talked a little bit about this exhibit here, then you talked about why you hadn't used this exhibit. What was the reason you did not choose to use a hand file?

A: It is just easier, the power tool just takes less time and power tool is actually on my desk where as the tool box is down the hall.

Q: So you did use the dremel. Did you ever place the firearm in a vice to hold while you went and used the dremel?

A: No.

Q: Just hold it firm with one hand, used the dremel with the other?

A: Yes.

Q: Did you have to supply any parts to make the gun operable?

A: No, other than the burr everything was in proper working condition.

Q: Can you agree with me you did have to, however, alter a part of the weapon to make it operable?

A: I had to alter the chamber rim, yes.

Q: We will both agree you did show the Judge as well as the district attorney this chamber rim on the interior of the gun, not the exterior of the gun?

A: Correct, this is—the slide is pulled back, you would not be able to see the chamber rim.

Q: You described this gun having a cheaper alloy?

A: It is just—it is not a very high end firearm.

Q: Also you mentioned it took a little bit of work to make it to be operable and you described that about twenty seconds?

A: Correct, yes, with the power tool.

\* \* \*

Q: Was the gun submitted to you that day capable of firing a shot?

A: Well, the pistol was submitted in July and I actually didn't take physical custody until September. But in that entire time it was locked in our evidence room where it wasn't touched. Yes, I got it in September, nobody else touched it or anything, was definitely inoperatble [*sic*].

Q: Incapable of say firing a shot when you first looked at it?

A: Yes.

N.T. 4/3/09 at 34–44.

In addition, Mr. Very testified that the gun's serial number had been obliterated. N.T. 4/3/09 at 45. Specifically, the serial number had been "ground smooth which means some type of grinding tool was used to take the serial number down." N.T. 4/3/09 at 45. When asked whether the grinding tool could have been "a dremel," Mr. Very responded, "Possibly, yes." N.T. 4/3/09 at 45. However, Mr. Very further indicated that a file or any "hard metal" tool could have been used to scrape away the serial number. N.T. 4/3/09 at 45. Finally, Mr. Very indicated that the gun was not loaded and there was no ammunition submitted to the lab. N.T. 4/3/09 at 46.

At the conclusion of all testimony, the trial court convicted Appellant of the offenses indicated *supra*, and on July 22, 2009, Appellant was sentenced to an aggregate of eleven and one-half months to twenty-three months in prison, to be followed by ten years of probation. Appellant filed a timely motion for reconsideration of sentence, which the trial court granted in part. That is, the trial court denied Appellant's request to modify his probationary term; however, the trial court agreed to permit Appellant to participate in a Service Plan administered by Justice Related Services upon Appellant's release from incarceration. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

■ As indicated *supra*, Appellant's sole contention is that the evidence was insufficient to sustain his conviction for carrying a firearm without a license under 18 Pa. C.S.A. § 6106 since the Commonwealth failed to prove the firearm was "operable."

In this case, the pertinent statutory provisions of the Pennsylvania Uniform Firearms Act ("the Firearms Act") provide in relevant part:

**§ 6106. Firearms not to be carried without a license**

**(a) Offense defined.—**

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S.A. § 6106(a)(1) (bold in original).

**§ 6102. Definitions**

Subject to additional definitions contained in subsequent provisions of this subchapter which are applicable to specific provisions of this subchapter, the

following words and phrases, when used in this subchapter shall have, unless the context clearly indicates otherwise, the meanings given to them in this section:

\*     \*     \*

"**Firearm.**" Any pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt or cylinder, whichever is applicable.

18 Pa.C.S.A. § 6102 (bold in original).

Appellant's argument that the Commonwealth was required to prove the firearm was "operable" for purposes of Section 6106 is based upon the Supreme Court's holding in *Commonwealth v. Layton*, 452 Pa. 495, 307 A.2d 843 (1973), and its progeny. Appellant submits that *Layton* stands for the proposition that where there is evidence that the firearm was inoperable under Section 6106 the burden shifts to the Commonwealth to prove either the firearm was operable or Appellant had under his control the means to convert the inoperable firearm into an operable firearm.

The issue in *Layton* was whether an inoperable pistol was a firearm for purposes of the Firearms Act. The appellant in that case was convicted under 18 P.S. § 4628(d), a provision of the Firearms Act that has been repealed and is now codified at 18 Pa.C.S.A. § 6105. In *Layton*, the Supreme Court reversed a conviction for illegal possession of a handgun under now repealed Section 4628(d) because the handgun was inoperable and the record failed to establish why the gun would not fire. At the time of *Layton*, the Firearms Act defined a firearm as "any pistol or revolver

with a barrel less than twelve inches, any shotgun with a barrel less than twenty-four inches or any rifle with a barrel less than fifteen inches." *Layton* at 844 (quoting 18 P.S. § 4628(a) (repealed)). The Supreme Court opined that the Firearms Act "was obviously intended to cover only objects which could cause violence by firing a shot." *Id.* Specifically, the Supreme Court explained in *Layton:*

> The Act ... was obviously intended to cover only objects which could cause violence by firing a shot. An object, therefore, which is incapable of firing cannot be a cause of violence within the intention of Section (d) of the Act. In this case, the parties agree that the object was not capable of firing-inoperable. The appellant did not therefore violate Section (d) of the Act.

> A reasonable fact finder may, of course, infer operability from an object which looks like, feels like, sounds like or is like, a firearm. Such an inference would be reasonable without direct proof of operability. The inference of operability, however, cannot reasonably be made where all parties agree that the object was not operable.

> Even though the object was not operable, a violation of Section (d) of the Act might be sustained if the alleged actor had under his control the means to convert the object into one capable of firing a shot. This is so because Section (d) of the Act specifically states that a violation takes place if the firearm is under the control of the alleged actor. An operable firearm may be said to be under the control of the alleged actor even though it is a malfunctioning assembled firearm or a disassembled firearm, if the alleged actor has under his control the means to convert the inoperable firearm into an operable firearm. For example, a reasonable fact finder might conclude,

under all the circumstances that an operable firearm was under the control of the actor even though the stock, barrel, trigger housing group, or firing mechanism were in different rooms in the same apartment or might infer control if a damaged part were readily repairable. If it can reasonably be concluded that the actor owned, possessed or controlled an operable firearm, there is a risk of violence by the firing of a shot[,] which was the result sought to be avoided[.] *Layton*, at 498–99, 307 A.2d at 844–45 (citations omitted).

Following *Layton*, when presented with the issue of whether the evidence was sufficient to sustain a conviction under Section 6106, the appellate courts have applied the rules regarding operability as enunciated in *Layton*. For instance, most recently, in *Commonwealth v. Stevenson*, 894 A.2d 759 (Pa.Super.2006), the appellant contended the evidence was insufficient to support his conviction under, *inter alia*, Section 6106. In finding the evidence to be sufficient, this Court, citing to *Layton*, began with the proposition that "[i]n order to sustain convictions under [this] section, the firearm in question must have been operable or capable of being converted into an object that could fire a shot." *Stevenson*, 894 A.2d at 775 (citing *Layton*, *supra*; *Commonwealth v. Berta*, 356 Pa.Super. 403, 514 A.2d 921 (1986) (con-

struing Section 6106); *Commonwealth v. Siiams*, 260 Pa.Super. 409, 394 A.2d 992 (1978) (construing Section 6106)). *See also Commonwealth v. Thomas*, 988 A.2d 669, 672 (Pa.Super.2009) ("The original definition of the term firearm, which is codified at 18 Pa.C.S.A. § 6102, focuses solely on barrel length or the overall length of the weapon. The Uniform Firearms Act continues to utilize that definition, unless otherwise noted, and therefore certain sections retain the requirement in *Layton*.").[4] In *Stevenson*, the handgun's firing pin fell out during test-firing, and therefore, the appellant argued the handgun was inoperable. However, noting the handgun functioned normally during a field test and initial test-firing, and fell out only later, following the handgun's normal operation, this Court held the handgun was operable for purposes of Section 6106. In any event, this Court noted since "the means to make the handgun operable again, after a slight malfunction, were readily available to [the appellant], the weapon was 'operable' pursuant to the Supreme Court's analysis in *Layton* and this Court's analysis in *Siiams*." *Stevenson*, 894 A.2d at 776.

In the case *sub judice*, it is undisputed that the firearm, as recovered, was inoperable. The issue is whether the gun was "capable of being converted into an object that could fire a shot." *Stevenson*, 894

4. In *Commonwealth v. Thomas*, 988 A.2d 669 (Pa.Super.2009), this Court rejected *Layton's* and *Stevenson's* holdings regarding operability as to convictions under 18 Pa.C.S.A. § 6105, persons not to possess firearms. In so doing, this Court concluded that Section 6105 includes a revised definition of "firearm" under which operability is not an essential element. Although not directly at issue, this Court in *Thomas* also noted that the definition of "firearm" for certain enumerated subsections of Section 6106 has been revised to indicate "[f]or purposes of subsection (b)(3), (4), (5), (7), and (8), the term 'firearm' shall include any weapon which is designed

to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of the weapon." 18 Pa.C.S.A. § 6106(e). This Court in *Thomas* suggested that, for purposes of those subsections in Section 6106, operability is not an essential element. *Thomas*, 988 A.2d at 671–72. In any event, it is clear that, in the case *sub judice*, Appellant was not convicted under any of the subsections enumerated in Section 6106(e), and consequently, we conclude the applicable meaning of "firearm" should be derived from the general definition set forth in 18 Pa.C.S.A. § 6102, as construed by *Layton* and *Stevenson*.

A.2d at 774 (citations omitted). Unlike in *Layton*, where there was no evidence to explain why the gun would not fire, the Commonwealth in this case offered testimony from firearms expert Jason Very establishing that the pistol would not initially fire because a metal burr had formed in the interior of the pistol at the top rim of the firing chamber, thus preventing a round from chambering. That is, due to repeated firing without a cartridge in the chamber, the firing pin hit the rim of the chamber, causing the metal to deform over time. However, Mr. Very further testified that he made the pistol operable by grinding the metal burr with a small, battery-operated handheld tool. He indicated that it took him less than twenty seconds to grind away the metal burr and he could have grinded the metal burr with many different types of tools, including a manual file. Mr. Very testified that any tool used to grind metal could have been used to remove the metal burr and anyone attempting to chamber a round into the pistol would have realized there was something obstructing the cartridge. Mr. Very indicated that the burr was visible with the naked eye, and he did not need to use a vice to grind the metal burr. Mr. Very testified that he supplied no parts to make the pistol operable and, once the small, metal burr was filed away, the pistol was fully operable. Finally, Mr. Very noted that the pistol's serial number had been obliterated and "ground smooth which means some type of grinding tool" was used to grind away the metal serial number.

Based on the aforementioned, viewing the evidence in the light most favorable to the Commonwealth, we conclude the evidence was sufficient to establish that Appellant's pistol was readily repairable/capable of being converted into an object that could fire a shot by means within Appellant's control as is required by *Layton* and *Stevenson*.

We reject Appellant's contention that the Commonwealth was required to show that Appellant had in his possession the tools required to repair the pistol, that Appellant was aware of the pistol's inoperability, or that Appellant had the knowledge or expertise needed to remove the metal burr. Such factors are not essential elements with regard to the inquiry of operability as enunciated by *Layton* and its progeny. Rather, the appellate courts have simply sought to determine whether the pistol could be made to shoot a bullet, which is the violence the Legislature sought to remedy. *See Layton, supra; Siiams, supra.* The finder of fact concluded that here, as in *Stevenson* and *Siiams*,[5] the defective weapon was readily repairable by means available to its possessor, Appellant. As the Commonwealth's evidence demonstrating the obstruction caused by the metal burr was readily repairable, we conclude the evidence was sufficient to sustain the finding the pistol was "operable" for purposes of establish-

5. In *Siiams*, the weapons expert testified that, due to a mechanical defect, the pistol would not shoot a bullet; however, the pistol successfully test-fired when the barrel pivot pin was held against the grip plate with a pair of pliers. Based on the expert testimony, the *Siiams* Court concluded the appellant had the means available to render the pistol capable of firing a shot under the guidelines of *Layton*. In making this determination, the *Siiams* Court did not consider whether the appellant had the knowledge, ability, or tools necessary to repair the weapon; but rather, the *Siiams* Court simply found the pistol could be made to shoot a bullet. Whether the appellant in *Siiams* knew why the pistol failed to function or what type of "repairs" would render the pistol operable were not relevant factors. Such is also the case here.

ing a violation of 18 Pa.C.S.A. § 6106. Therefore, we affirm.

Affirmed.