J-A22019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Z.G., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2679 EDA 2024 |

Appeal from the Dispositional Order Entered August 26, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-JV-0000047-2024

BEFORE: LAZARUS, P.J., LANE, J., and STEVENS, P.J.E.*

MEMORANDUM BY LANE, J.:                    **FILED OCTOBER 21, 2025**

Z.G., a minor ("Z.G."), appeals from the dispositional order imposed following his adjudication of delinquency for firearms not to be carried without a license, carrying firearms in public in Philadelphia, possession of a firearm by a minor, and resisting arrest.[1] After careful review, we affirm.

By way of background, the juvenile court summarized the relevant factual and procedural history as follows. The Commonwealth filed a delinquency petition, alleging Z.G., then sixteen years old, committed firearms and resisting arrest offenses. Z.G. filed a motion to suppress evidence of the firearm recovered during a traffic stop, contending that the stop, frisk, search, and arrest were unlawful under the Pennsylvania and federal constitutions.

_____

* Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A §§ 6106(a)(1), 6108, 6110.1(a), 5104.

On August 26, 2024, the juvenile court conducted a hearing on Z.G.'s suppression motion. The court summarized the evidence presented as follows. On January 10, 2024, between 6:00 and 6:30 p.m., Philadelphia Police Officer Carlos Diaz ("Officer Diaz") was on duty with his partner, Officer Watson[2] ("Officer Watson"). Officer Watson was driving, and Officer Diaz was the passenger. Officer Diaz testified to the following:

> [He and Officer Watson] observed a black Chevy Cruz disregarding a stop sign at Monticello [Street.] The officers then followed the vehicle and [Officer Watson initiated a vehicle stop. As] the vehicle was stopping, [Officer Diaz] observed two occupants in the vehicle[, the driver and Z.G., who was in the rear passenger seat]. The officer further testified that when [the] vehicle was stopping, he observed [Z.G.] moving, and when the vehicle stopped, he could see [Z.G.] reaching forward and adjusting his waistband area.
>
> After the vehicle stopped[,] Officer Watson started investigating the driver, asking for [identification and] other information, while Officer Diaz was standing by right outside of the passenger door. As Officer Watson was talking to the driver, Officer Diaz was talking to Z.G. when he saw [him] sweating, stiff[en]ing up, and sitting up straight. Officer Diaz previously interacted with Z.G., where [he] would generally engage and talk to the officer. He became suspicious of Z.G.'s inconsistent behavior and informed his partner.
>
> A crowd started to form on the sidewalk . . .. Officer Diaz then called for backup [for officer safety because officers were previously shot in the area,] and asked the occupants to step out of the vehicle. While Z.G. was exiting the vehicle, ***he kept putting his hands down towards his front, even though the officers had asked him to put his hands up multiple times***. Officer Diaz observed that Z.G. was tensed and that his hands were stiff[en]ing up, so the officer went to Z.G.'s front and tried to put Z.G.'s hands up when he felt the firearm on Z.G.'s

_____

[2] The certified record does not indicate Officer Watson's first name.

waistband. Officer Diaz immediately informed his partner that Z.G. had a "ladder," meaning a "firearm with [an] extended magazine on it."

[Approximately five or seven minutes later, a]s other officers arrived at the scene, Z.G. fled from the officers, preventing them from arresting and frisking him to remove the firearm. The officers had to tase him and forcibly take him down to arrest him and recover the firearm, a Glock 23[ .]40 caliber.

Juvenile Court Opinion, 12/18/24, at 2-5 (citations and unnecessary capitalization omitted and emphasis and paragraph breaks added).[3] The juvenile court also watched video taken from Officer Diaz's body worn camera. Z.G. did not testify or present any evidence.

At the conclusion of the suppression hearing, Z.G. argued that the traffic stop was unlawful because, *inter alia*, the officers did not issue any citation. *See* N.T., 8/26/24, at 35-42. Z.G. further averred that the officers improperly prolonged the stop beyond the time necessary to address the alleged traffic infraction and lacked reasonable suspicion to frisk him. Z.G. maintained that his movements and posture while seated in the vehicle did not justify a frisk, and he claimed that the officers violated his constitutional rights by following a practice of frisking passengers whenever they removed them from a vehicle. Accordingly, Z.G. asserted that the juvenile court should suppress the firearm recovered from his person because it was the fruit of an unlawful stop and frisk.

_____

[3] For ease of review, when quoting the juvenile court's opinion, we have changed the references to "the Juvenile" and "the defendant" to "Z.G."

- 3 -

The juvenile court issued its factual and legal findings on the record and denied Z.G.'s motion to suppress. It found the stop, frisk, and arrest were lawful and thus denied Z.G.'s suppression motion. *See id*.at 48-50. The juvenile court then proceeded immediately to an adjudication hearing. The juvenile court incorporated the testimony from the suppression hearing and accepted the parties' stipulation as to Z.G.'s character testimony.

Z.G. then moved for a judgment of acquittal, arguing that the Commonwealth failed to prove the recovered firearm was operable, an essential element of the firearm offenses. Z.G. further contended that: (1) his actions did not constitute resisting arrest, where he was immediately subdued with a taser and handcuffs; (2) he voluntarily complied with officers' commands; and (3) he did not pose any substantial risk of injury, as corroborated by the body-worn camera footage. In response, the Commonwealth argued that the evidence — including Z.G.'s age, the location of the alleged firearm, and the video footage showing the officers' repeated commands and the use of a taser — supported each of the charges.

The juvenile court concluded that the recovered firearm — described by the officer as a "ladder," meaning a Glock 23 .40 caliber with an extended magazine — qualified as an operable weapon under existing case law. Based on the testimony, video evidence, and the circumstances of the arrest, the juvenile court determined that the Commonwealth had proved all charges beyond a reasonable doubt.

The juvenile court then heard testimony from

. . . Z.G.'s therapist, Melissa George. The therapist testified that Z.G. was shot in 2023, which caused him trauma regarding his safety, and he had been getting therapy for it. The therapist also testified that Z.G. is generally well-behaved in the community and a leader amongst his peers.

Juvenile Court Opinion, 12/18/24, at 5-6.

Immediately thereafter, the juvenile court adjudicated Z.G. delinquent of firearms not to be carried without a license, carrying firearms in public in Philadelphia, possession of a firearm by a minor, and resisting arrest. The court placed Z.G. on probation. Z.G. filed a timely post-dispositional motion, which the court denied by operation of law. Thereafter, Z.G. timely filed a notice of appeal. Both Z.G. and the juvenile court complied with Pa.R.A.P. 1925.

Z.G. presents four issues for our review:

[1.]  Did the [juvenile] court err in denying Z.G.'s motion to suppress where the police lacked reasonable suspicion of criminal activity to justify prolonging the traffic stop beyond the time reasonably required to issue a ticket for the alleged traffic violation; and the evidence was insufficient to establish that the officers involved possessed reasonable suspicion that Z.G. was armed and dangerous prior to frisking Z.G.?

[2.]  Was the evidence insufficient to establish that Z.G. committed three firearms offenses, 18 Pa.C.S.[A.] §§ 6106(a)(1)[,] 6108 [,] and 6110.1(a), where the Commonwealth presented no evidence that [Z.G.] possessed an operable firearm, as defined by 18 Pa.C.S.[A.] § 6102?

[3.]  Was the evidence insufficient to establish that Z.G. committed the act of resisting arrest, 18 Pa.C.S.[A.] § 5104, where the underlying arrest was not lawful, and the

- 5 -

Commonwealth presented no evidence that Z.G. created a substantial risk of bodily injury to a public servant or employed means of resistance which justified or required substantial force to overcome resistance?

[4.] Did the [juvenile] court err and abuse its discretion in adjudicating Z.G. delinquent, where the Commonwealth presented no evidence that Z.G. is in need of treatment, supervision, or rehabilitation; Z.G. presented evidence that he is not in need of treatment, supervision, or rehabilitation; and the [juvenile]court relied solely on the nature of the charges when reaching its decision?

Z.G.'s Brief at 3-4.

In Z.G.'s first issue on appeal, he argues that the juvenile court improperly denied his motion to suppress the firearm recovered during the traffic stop. In our review of an order denying a pretrial motion to suppress, the following serves as our guidance:

[O]ur standard of review . . . is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. Yandamuri***, 159 A.3d 503, 516 (Pa. 2017) (citations and footnote omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." ***Commonwealth v.***

*Bozeman*, 205 A.3d 1264, 1270 (Pa. Super. 2019) (citation and quotation marks omitted).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures.  *See Commonwealth v. Thompson*, 289 A.3d 1104, 1107 (Pa. Super. 2023).  Pennsylvania courts recognize "three levels of interaction between the police and citizens: (1) a mere encounter, (2) an investigative detention,[4] and (3) a custodial detention." *Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023) (citation omitted).

> As this Court has stated:
>
> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen.  The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest.  Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.
>
> In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id*. (citations omitted and paragraph break added).

---

[4] An investigative detention, or *Terry* stop, is lawful if supported by reasonable suspicion that criminal activity may be afoot.  *See Terry v. Ohio*, 392 U.S. 1, 22 (1968).

Furthermore, this Court has explained:

A police officer has the authority to stop a vehicle when he or she has **reasonable suspicion** that a violation of the vehicle code has taken place, for the purpose of obtaining necessary information to enforce the provisions of the code. 75 Pa.C.S.A. § 6308(b). However, if the violation is such that it requires no additional investigation, the officer must have **probable cause** to initiate the stop.

*Id*. at 312 (some citations omitted). It is "settled law that a motor vehicle stop is generally a second-level interaction, an investigative detention." *Id*. at 314.

"In the context of a traffic stop, . . . the duration of police inquiries 'is determined by the seizure's 'mission' — to address the traffic violation" underlying the stop as well as to "attend to related safety concerns." *Commonwealth v. Ross*, 297 A.3d 787, 792 (Pa. Super. 2023) (citation omitted). An "officer's mission includes ordinary inquiries incident to the traffic stop[,] such as checking the driver's license," registration, and insurance and determining whether the driver has any outstanding warrants. *Id*. (citation omitted). Importantly:

[T]asks relating to officer safety are also part of a traffic stop's mission when done purely in an interest to protect the officers. This safety interest stems from the fact that traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.

*Id*. at 792-793 (quotation marks, some brackets, and citations omitted).

Finally, this Court has emphasized that "actions police officers may undertake during a lawful traffic stop [are justified] based solely on concerns

- 8 -

for their safety and security and without independent justification or cause."

*Id*. at 798. In balancing those interests, an

> officer may order the [occupants] of a vehicle to exit the vehicle until the traffic stop is completed, ***even absent a reasonable suspicion that criminal activity is afoot***. . . . We have recognized that when an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car. Allowing police officers to control all movement in a traffic encounter is a reasonable and justifiable step towards protecting their safety.
>
> Further, if there is a legitimate stop for a traffic violation additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions.
>
> Additionally, the officer may conduct a pat-down of a suspect's outer garments if the officer observes conduct that leads him to reasonably believe the suspect may be armed and dangerous. In considering whether evidence supports a ***Terry*** frisk, we are guided by common sense concerns, giving preference to the safety of the officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon. In order to establish reasonable suspicion, the police officer must articulate specific facts from which he could reasonably infer that the individual was armed and dangerous. When assessing the validity of a ***Terry*** frisk, we examine the totality of the circumstances.

***Commonwealth v. Wright***, 224 A.3d 1104, 1109 (Pa. Super. 2019) (emphasis added and citations, footnote, ellipses, brackets and quotation marks omitted).

Z.G. argues that the juvenile court erred in denying suppression because Officer Diaz lacked reasonable suspicion to frisk him. Z.G. maintains that Officer Diaz's two observations of him — "some hand movement," while

sitting in the car as the vehicle was stopping, and his sweating, when Officer Diaz stood outside the vehicle — were the sole bases cited for the alleged reasonable suspicion. Z.G. argues these were insufficient under **Rodriguez v. United States**, 575 U.S. 348 (2015), and **Commonwealth v. Reppert**, 814 A.2d 1196 (Pa. Super. 2002) (*en banc*). Z.G. contends that the officers had already completed the purpose of the stop — addressing the driver's failure to stop at a stop sign — yet continued to detain the occupants without issuing a citation or warning. Finally, Z.G. argues that Officer Diaz admitted he waited for backup before ordering the occupants out of the vehicle, which unlawfully prolonged the stop prior to the frisk.

The juvenile court concluded otherwise. At the suppression hearing, the juvenile court found that the officers had probable cause to stop the vehicle and reasonable suspicion to frisk Z.G. The juvenile court referenced Officer Diaz's testimony that the vehicle disregarded a stop sign, which provided legal justification for the stop under the Pennsylvania Vehicle Code, regardless of whether the officers ultimately issued a citation. The juvenile court determined that, under the totality of the circumstances: (1) the duration of the stop was not excessive, as the officers needed time to investigate the driver and confirm relevant information; and (2) the officers had reasonable suspicion to frisk Z.G. for their safety and the safety of others. The juvenile court noted that body-worn camera footage corroborated the officers' account,

including the moment the officer felt the firearm on Z.G.'s waistband and alerted other officers.

At the suppression hearing, the juvenile court found:

> . . . As to . . . how long the investigation took, I think [Z.G.] argued that it was seven minutes or more, it's too long. I don't believe that's too long. At that point they have probable cause to stop the car. And they have to confirm. . . .
>
> * * * *
>
> Under **Terry**, . . . the officers can have justification for their protection and protection of others nearby. You can see there was a crowd. [T]he officer observed [Z.G. and] he was known to the officer in the past. The officer indicated that he was sweating.
>
> The officer was told by his partner that the [rear occupant] was moving in the car at the time that they had attempted to stop the car. Taking the totality of the circumstances, the court finds there was reasonable suspicion and for the protection of the officers for the officer to attempt to frisk and search [Z.G.], the juvenile in this case.
>
> And at that point, based on the video, . . .you can hear the police officer telling [Z.G.] to keep his hands up. And then as the officer testified, tried to keep his hands up, he felt — as he's trying to put his — Z.G.'s hands up, he felt what he called. And you can certainly hear it in the video where he's calling out to the other officers that there is a ladder.
>
> And he explained what a ladder meant. . . .

N.T., 8/26/24, at 49-50.

The juvenile court further explained in its written opinion:

> . . . The officers initiated a lawful investigatory stop as they witnessed Z.G.'s vehicle violating traffic laws by disregarding the stop sign. . . .Officer Diaz observed . . . Z.G.'s anxious behavior and the fact that Officer Diaz observed [him] adjusting his waistband area before stopping the vehicle led the officers to have reasonable suspicion that Z.G. might be armed and dangerous.

The officers then became concerned for their and the crowds' safety and called for backup since plenty of officers had been shot in the area before. . . .

Officer Diaz was trying to put Z.G.'s hands up when he felt a firearm on [his] waistband. Officer Diaz, based on his experience as a police officer, immediately knew the contraband on Z.G.'s waistband was a firearm and informed his partner calling out that Z.G. has a "ladder." Another officer later recovered the firearm from Z.G. . . .

Moreover, at [the suppression hearing], Officer Diaz articulated facts and drew reasonable inferences in light of his experiences that Z.G. might be armed and dangerous, which was also [corroborated] by his body-worn camera. The court found Officer Diaz's testimony and the video of his body-worn camera credible. . . .

Juvenile Court Opinion, 12/18/24, at 8-9 (paragraph breaks added).

After careful review, we determine that the juvenile court did not err in denying Z.G.'s suppression motion, as the record supports its findings that the traffic stop and frisk were lawful. *See Yandamuri*, 159 A.3d at 516. The officers observed the driver fail to stop at a posted stop sign, providing probable cause to initiate the stop. *See Spence*, 290 A.3d at 312, 314. The absence of a citation did not negate the officers' authority to act. Once the stop was underway, the officers were entitled to take reasonable steps to ensure their safety. *See Ross*, 297 A.3d at 792. Since "traffic stops are especially fraught with danger to police officers," the officers properly ordered the driver and Z.G. out of the vehicle, "***even absent a reasonable suspicion that criminal activity is afoot***." *Ross*, 297 A.3d at 793; *see also Wright*, 224 A.3d at 1109 (emphasis added).

Z.G.'s reliance on *Reppert*, is misplaced. In *Reppert*, this Court held that a traffic stop had concluded by the time the officer asked the passenger to exit the vehicle and explained that nervousness and furtive movements *alone* do not establish reasonable suspicion. *See Reppert*, 814 A.2d at 1205 (emphasis added). Here, by contrast, Officer Diaz observed Z.G. in the rear passenger seat reaching forward and adjusting his waistband, sweating, and sitting rigidly, despite repeated commands to keep his hands up. The officers had not completed the stop, and the scene was volatile, occurring in an area where officers had previously been shot. These specific and articulable facts, viewed in light of the totality of the circumstances, provided reasonable suspicion to frisk Z.G. for officer safety. *See Wright*, 224 A.3d 1109.

When Z.G. resisted commands to raise his hands, Officer Diaz attempted "to put Z.G.'s hands up" and immediately felt a firearm, described as a "ladder," a Glock 23 .40 caliber with an extended magazine. Trial Court Opinion, 12/18/24, at 8. The juvenile court credited Officer Diaz's testimony and found the officers' actions reasonable under the circumstances; thus, we are bound by those credibility determinations. *See Bozeman*, 205 A.3d at 1270. The record supports the juvenile court's factual findings, and its legal conclusions were consistent with governing precedent. Z.G.'s first issue is therefore without merit.

In his second and third issues on appeal, Z.G. challenges the sufficiency of the evidence supporting his adjudication for firearms offenses and resisting

arrest. We begin by noting that "[t]he Juvenile Act[5] grants juvenile courts broad discretion when determining an appropriate disposition. . . . We will disturb a juvenile court's disposition only upon a showing of a manifest abuse of discretion." *In re C.A.G.*, 89 A.3d 704, 709 (Pa. Super. 2014) (citations omitted and footnote added). Moreover, "[i]n a juvenile proceeding, the hearing judge sits as the finder of fact." *In re L.A.*, 853 A.2d 388, 391 (Pa. Super. 2004).

A challenge to the sufficiency of the evidence presents a question of law, for which this Court's standard of review is *de novo*, and our scope of review is plenary. *See Interest of E.L.W.*, 273 A.3d 1202, 1205 (Pa. Super. 2022). Furthermore:

> When a juvenile is charged with an act that would constitute a crime if committed by an adult, the Commonwealth must establish the elements of the crime by proof beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth. In determining whether the Commonwealth presented sufficient evidence to meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.
>
> The facts and circumstances established by the Commonwealth need not be absolutely incompatible with a [juvenile's] innocence. Questions of doubt are for the hearing judge, unless the evidence is so weak that, as a matter of law, no probability of fact can be

_____

5 *See* 42 Pa.C.S.A. §§ 6301-6387.

drawn from the combined circumstances established by the Commonwealth. The finder of fact is free to believe some, all, or none of the evidence presented.

*Id*. (citation omitted).

The Pennsylvania Crimes Code[6] defines possession of a firearm by a minor as follows: "[A] person under [eighteen] years of age shall not possess or transport a firearm anywhere in this Commonwealth."18 Pa.C.S.A. § 6110.1(a). Section 6106(a)(1) prohibits carrying a firearm in a vehicle or on one's person without a valid license. *See* 18 Pa.C.S.A. § 6106(a)(1). Section 6106 is graded as a felony of the third degree unless an the defendant is "otherwise eligible" and "has not committed any other criminal violation[.]" 18 Pa.C.S.A. § 6106(a)(2); *see also Commonwealth v. Bavusa*, 832 A.2d 1042, 1052 (Pa. 2003) (holding that defendant's contemporaneous violation of the statute prohibiting carrying firearms on public streets in Philadelphia supports felony grading for carrying a firearm without a license). Section 6108 prohibits carrying a firearm on public streets of Philadelphia unless the defendant is licensed or exempt. *See* 18 Pa.C.S.A. § 6108.

Section 6102 defines a firearm by barrel and overall length. *See* 18 Pa.C.S.A. § 6102. With respect to a possession of a firearm offense, this Court has stated:

> A reasonable fact finder may . . . infer operability from an object which looks like, feels like, sounds like or is like, a firearm. Such an inference would be reasonable without direct proof of

---

[6] *See* 18 Pa.C.S.A. §§ 101-9546.

- 15 -

operability.  The inference of operability, however, cannot reasonably be made where all parties agree that the object was not operable.

*Commonwealth v. Gainer*, 7 A.3d 291, 297 (Pa. Super. 2010) (*quoting Commonwealth v. Layton*, 307 A.2d 843, 844 (Pa. 1973)).  However, "the Commonwealth is not required to prove that the gun that the defendant possessed was operable *unless evidence has been introduced that the gun was inoperable*."  *Commonwealth v. Mead*, 326 A.3d 1006, 1013 (Pa. Super. 2024) (emphasis added).

Section 5104 provides that a person commits resisting arrest "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance."  18 Pa.C.S.A. § 5104.  An arrest must be lawful and supported by authority and probable cause.  *See Commonwealth v. Maxon*, 798 A.2d 761, 770 (Pa. Super. 2002).  Even passive resistance that requires police to use substantial force satisfies the statute.  *See Commonwealth v. McDonald*, 17 A.3d 1282, 1285 (Pa. Super. 2011).

Z.G. argues that the Commonwealth failed to present evidence establishing that the firearm was operable, as required by *Layton*, 307 A.2d 843, and *Gainer*, 7 A.3d 291.  Z.G. contends that no officer testified regarding

the weapon's functionality, or other technical details.[7]  Z.G. further contends

that his conduct did not constitute resisting arrest, asserting that he

voluntarily complied with officers' commands and did not pose a substantial

risk of injury, as corroborated by body-worn camera footage.

The juvenile court concluded that the Commonwealth presented

sufficient evidence to prove each charged offense beyond a reasonable doubt.

With respect to the firearms charges, the juvenile court cited **Gainer** and

reasoned:

> Evidence showing the firearm was under the defendant's control
> is sufficient to support a conviction for carrying a firearm without
> a license, **even if the firearm is inoperable when recovered**.
> Even a malfunctioning assembled firearm or a disassembled
> firearm can be considered an operable firearm under the
> defendant's control if the defendant can convert the inoperable
> firearm into an operable firearm that could fire a shot.

Juvenile Court Opinion, 12/18/24, at 11 (*citing* **Gainer**, 7 A.3d at 297)

(emphasis added).   The court then found that Z.G. "was in complete

---

[7] Z.G. also avers that when Officer Diaz identified the type of firearm recovered, he merely recited the property receipt and/or what other unidentified officers said, and this was inadmissible hearsay.  **See** Z.G.'s Brief at 28-29.  However, the record does not reveal, and Z.G. does not claim, that he made any objection before the juvenile court to Officer Diaz's testimony. Thus, he has waived any challenge to the admission of this testimony.  **See** Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); **see also** **Commonwealth v. Schrader**, 141 A.3d 558, 565 (Pa. Super. 2016) (holding that where defendant failed to object to admission of evidence before the trial court, he cannot now complain that the trial court erred in admitting the evidence, and the evidence was properly before this Court when reviewing the sufficiency of the evidence).

possession of the firearm, [a] Glock 23[ .]40 caliber with an extended magazine, known as a 'ladder,' when the police recovered it from [his] waistband." *Id*. at 12. The court further reasoned:

> Z.G.'s possession and control over the firearm is sufficient to establish that the firearm was operable. Furthermore, as a minor, Z.G. could not be eligible for a license to carry a firearm, yet he was found carrying an operable firearm without a license on the public street of Philadelphia; therefore, the evidence presented at [the adjudication hearing] was sufficient to substantiate the charges of [sections] 6106(a)(1), 6108, and 6110.1(a) against [him] beyond a reasonable doubt.

*Id*.

> With respect to the charge of resisting arrest, the juvenile court found:

> [I]n the instant case, not only did the officers have reasonable suspicion to stop and frisk Z.G., but [O]fficer Diaz felt a firearm with extended magazine on [his] waistband, which gave the officers probable cause to arrest [him] and frisk him to recover the firearm. Instead of complying with the officers, Z.G. fled from the officers, preventing them from discharging their duty of arresting and frisking him to remove the firearm. The officers had to tase him and forcibly take him down to arrest him. Z.G. employed a means to resist arrest by fleeing from the police officers. As a result, the officers were required to use substantial force by tasing Z.G. to prevent him from resisting arrest. The evidence presented . . . was sufficient to establish that Z.G. had violated the statute of resisting arrest beyond a reasonable doubt.

*Id*. at 12-13 (citations omitted).

Viewing the evidence in the light most favorable to the Commonwealth, the record supports the juvenile court's findings that the evidence was sufficient to sustain his convictions beyond a reasonable doubt. *See Interest of E.L.W.*, 273 A.3d at 1205. Here, Z.G. did not dispute that the officers recovered from his waistband a "ladder," or a Glock 23.40 caliber gun with an

- 18 -

extended magazine. At the adjudicatory hearing, Z.G. presented no **evidence** that the gun recovered from him was inoperable. Instead, Z.G.'s counsel only made a legal argument claiming that the Commonwealth failed to present evidence that the gun was operable. **See** N.T., 8/26/24, at 54-55. However, under controlling authority, the Commonwealth was not required to prove operability unless the defense first introduced evidence suggesting inoperability. **See Mead**, 326 A.3d at 1013. Based on our review of the entirety of the record and controlling precedent, we determine the evidence was sufficient to support the adjudications of the firearms offenses. **See Mead**, 326 A.3d at 1013; **see also Gainer**, 7 A.3d at 297.

On appeal, Z.G. now argues the juvenile court's interpretation or application of **Gainer** was erroneous. **See** Z.G.'s Brief at 30-31. However, the record contains no evidence or suggestion that the firearm was inoperable. The Commonwealth was not required to present proof of operability. **See Mead**, 326 A.3d at 1013.

Furthermore, we likewise conclude the record supports the juvenile court's findings as to the charge of resisting arrest. Z.G.'s flight from police during the lawful investigatory detention and arrest created a substantial risk and required officers to use substantial force, satisfying section 5104. **See McDonald**, 17 A.3d at 1285; **see also Maxon**, 798 A.2d at 770. Thus, Z.G.'s second and third issues lack merit.

In his fourth issue, Z.G. argues that the juvenile court abused its discretion by adjudicating him delinquent. As previously stated, this Court "will disturb a juvenile court's disposition only upon a showing of a manifest abuse of discretion." **C.A.G.**, 89 A.3d at 709. This Court has explained:

Under the Juvenile Act, a juvenile proceeding may be commenced, *inter alia*, by the filing of a petition alleging that the juvenile has committed delinquent acts. [If a juvenile] court concludes the juvenile committed the delinquent acts alleged in the delinquency petition, it must enter such finding on the record [T]he court must then determine whether the juvenile is in need of treatment, supervision or rehabilitation[.]

**Id**. at 712.

Evidence of the commission of a "felony is sufficient to sustain a finding that the juvenile is in need of treatment, supervision, or rehabilitation." Pa.R.J.C.P. 409, *comment* (*citing* 42 Pa.C.S.A. § 6341(b) (stating that "[i]n the absence of evidence to the contrary, evidence of the commission of acts which constitute a felony shall be sufficient to sustain a finding that the child is in need of treatment, supervision or rehabilitation")); **see also Commonwealth v. M.W.**, 39 A.3d 958, 966 n.9 (Pa. 2012).

In determining the appropriate disposition and whether a juvenile is need of treatment, supervision, and rehabilitation, a juvenile court must consider factors including: (a) protection of the community; (b) the juvenile's treatment and supervision needs; (c) the "development of competencies to enable the juvenile to become a responsible, productive member of the

community;" (d) accountability for the offenses; and (e) any other relevant factor. Pa.R.J.C.P. 512(D), *comment*.

Z.G. argues that the juvenile court erred in adjudicating him delinquent because the evidence did not show he was in need of treatment, supervision, or rehabilitation. Z.G. cites testimony from his therapist, letters of support, his compliance with GPS monitoring, lack of prior arrests, and good behavior at home and school to rebut the presumption of need created by the commission of the firearm offenses. Z.G. contends the Commonwealth presented no evidence to support the court's findings.

The juvenile court adjudicated Z.G. delinquent based on the substantiated felony firearms charges, corroborated by testimony and body-worn camera video. In reaching its decision, the juvenile court reasoned:

> The court explicitly stated that it was adjudicating Z.G. because the felony charge against [him] was substantiated through testimony and body-worn camera video. Thus, it takes the protection of the community and Z.G.'s accountability for the offenses committed.
>
> Furthermore, the court heard the testimony of Z.G.'s therapist regarding [his] trauma from being shot in 2023 and that he is getting therapy for it. The therapist also testified that Z.G. is generally well-behaved in the community and a leader amongst his peers. In light of Z.G.'s trauma from being shot, the court considered [him] carrying an extended magazine firearm without a license even more concerning.
>
> Taking Z.G.'s general behavior and offenses into consideration, the court adjudicated him delinquent but placed [him] in the community, allowing him to do well and continue with his services in the community. Thus, the record established by a preponderance of evidence shows that. . . , Z.G. was in need of

treatment and supervision by the least restrictive means by being placed on probation in the community.

Juvenile Court Opinion, 12/18/24, at 14 (citations omitted and paragraph breaks added).

After careful review, we conclude the juvenile court's decision was neither manifestly unreasonable nor unsupported by the record. *See Int. of K.C.*, 310 A.3d at 303. Z.G. does not dispute the juvenile court's reasoning that his commission of a felony alone was sufficient for a finding that he was in need of treatment, supervision, or rehabilitation. *See* Pa.R.J.C.P. 409, *comment*; *see also* Juvenile Court Opinion, 12/18/24, at 14. On this ground alone we may affirm the adjudication.

In any event, the record also demonstrates that the juvenile court considered the relevant factors, including the seriousness of the offenses, the circumstances of the incident, and Z.G.'s personal history. *See* Pa.R.J.C.P. 512(D), *comment*. Although Z.G. presented evidence through his therapist regarding his positive conduct and leadership in the community, the juvenile court acted within its discretion in determining that adjudication and probation were necessary to promote accountability and address the public safety concerns posed by his possession of a firearm and resisting arrest. *See* Pa.R.J.C.P. 409, *comment* (*citing* 42 Pa.C.S.A. § 6341(b)); *see also M.W.*, 39 A.3d at 966 n.9. Thus, Z.G.'s fourth issue is without merit. Accordingly, we affirm the dispositional order.

Dispositional order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/21/2025